80 F.3d 915
 67 Empl. Prac. Dec. P 43,971, 64 USLW 2630
 Paul G. THOMASSON, Lieutenant, United States Navy, Plaintiff-Appellant,
v.
William J. PERRY, Secretary of Defense; John H. Dalton,
Secretary of the Navy, Defendants-Appellees,
Union of American Hebrew Congregations; The American Jewish
Congress; National Organization for Women; Now Legal
Defense and Education Fund; Center for Women Policy
Studies; National Lesbian and Gay Law Association; Gay and
Lesbian Advocates and Defenders; American Civil Liberties
Union; Lambda Legal Defense and Education Fund;
Servicemembers Legal Defense Network; Iaomai, Incorporated;
Family Research Council; Iota Legal Defense Fund, Amici Curiae.
 No. 95-2185.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 5, 1995.
Decided April 5, 1996.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-95-252-A).
 ARGUED: Allan Baron Moore, Covington & Burling, Washington, D.C., for Appellant. Edwin Smiley Kneedler, United States Department of Justice, Washington, D.C., for Appellees. Professor William Allen Woodruff, Campbell University School of Law, Buies Creek, North Carolina, for Amicus Curiae Family Research Council. ON BRIEF: Mark H. Lynch, Covington & Burling, Washington, D.C., for Appellant. Frank W. Hunger, Assistant Attorney General, Helen F. Fahey, United States Attorney, Anthony J. Steinmeyer, John C. Hoyle, E. Roy Hawkens, Edward Himmelfarb, Civil Division, United States Department of Justice, Washington, D.C.; Lcdr. Edward S. White, Office of the Judge Advocate General, Department of the Navy, Washington, D.C., for Appellees. Melissa Wells-Petry, Washington, D.C., for Amicus Curiae Family Research Council. Chai R. Feldblum, Washington, D.C., for Amici Curiae Union of American Hebrew Congregations, et al. Beatrice Dohrn, Evan Wolfson, Jon W. Davidson, Lambda Legal Defense and Education Fund, New York City; Ruth E. Harlow, Marc E. Elovitz, Matthew Coles, American Civil Liberties Union Foundation, New York City, for Amici Curiae ACLU and Lambda Legal Defense and Education Fund. Jeffrey L. Bleich, Munger, Tolles & Olson, San Francisco, California; George C. Freeman, III, Hunton & Williams, Richmond, Virginia, for Amicus Curiae Servicemembers Legal Defense Network. Arthur C. Schulcz, Sr., Vienna, Virginia, for Amici Curiae IAOMAI and IOTA Legal Defense Fund.
 Before WILKINSON, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges, sitting en banc.
 Affirmed by published opinion. Chief Judge WILKINSON wrote the majority opinion, in which Judges RUSSELL, WIDENER, MURNAGHAN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, and WILLIAMS joined. Judge MURNAGHAN wrote a concurring opinion. Judge LUTTIG wrote a concurring opinion, in which Judges RUSSELL, WIDENER, WILKINS, HAMILTON, and WILLIAMS joined. Judge HALL wrote a dissenting opinion, in which Judges ERVIN, MICHAEL, and MOTZ joined.
 OPINION
 WILKINSON, Chief Judge:
 
 
 1
 Former Navy Lieutenant Paul G. Thomasson challenges the constitutional validity of Section 571 of the National Defense Authorization Act for Fiscal Year 1994, 10 U.S.C. § 654, and the Department of Defense Directive that governs homosexuality in the military, pursuant to which Thomasson received an honorable discharge from the Navy. We hold that the challenged statute is constitutional and that the discharge represented an appropriate exercise of military authority under the Act. In so holding, we affirm the judgment of the district court.
 
 I.
 A.
 
 2
 We shall set forth at the outset the relevant statutory framework in this case. In November, 1993, after lengthy deliberations, Congress approved and the President signed the National Defense Authorization Act, which codified a policy with respect to homosexuality and the armed forces. That policy came to be colloquially known as "Don't Ask, Don't Tell." In a series of findings that established the predicate for the policy, Congress declared that "[m]ilitary life is fundamentally different from civilian life," 10 U.S.C. § 654(a)(8), and that "[s]uccess in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion," 10 U.S.C. § 654(a)(6). Thus acknowledging that the demands of military life are distinctive, Congress further determined that "[t]he prohibition against homosexual conduct is a long-standing element of military law that continues to be necessary in the unique circumstances of military service." 10 U.S.C. § 654(a)(13). It also found that service members who demonstrate a "propensity or intent to engage in homosexual acts [ ] create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654(a)(15).
 
 
 3
 In order to avoid this risk, the Act provides that members shall be separated from the armed services if one of three findings is made: the service member engaged or attempted to engage in homosexual acts, 10 U.S.C. § 654(b)(1); the service member married or attempted to marry a person of the same sex, 10 U.S.C. § 654(b)(3); or the service member "stated that he or she is a homosexual ... unless there is a further finding ... that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." 10 U.S.C. § 654(b)(2). It is pursuant to this last provision--the "statements" provision--that Thomasson was honorably discharged from the Navy.
 
 
 4
 In December, 1993, the Department of Defense announced Directives implementing the Act. Like the statute, the applicable Directive provides for separation if an officer "has engaged in ... homosexual act[s]," "has married or attempted to marry" another of the same sex, or "has made a statement that he or she is a homosexual" and fails to demonstrate that "he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." DoD Dir. 1332.30, Encl. 2,p C, at 2-1, 2-2. The Directive also provides that the officer's statement "creates a rebuttable presumption that the officer engages in homosexual acts or has a propensity or intent to do so." DoD Dir. 1332.30, Encl. 2, p C.1.b., at 2-2. The officer is informed of this presumption and afforded an opportunity to rebut it by presenting appropriate evidence. Id. Whether the presumption has been rebutted is determined by a variety of factors: whether the officer has engaged in homosexual acts; the officer's credibility; testimony from others about the officer's past conduct; the nature and circumstances of the officer's statement; and any other evidence relevant to whether the officer has a propensity or intent to engage in homosexual acts. Id.
 
 B.
 
 5
 Paul G. Thomasson, the plaintiff in this case, rose to the rank of Lieutenant in his ten year Naval career. Thomasson's service record has been a commendable one. Thomasson v. Perry, 895 F.Supp. 820, 823, 829 (E.D.Va.1995). Thomasson consistently received the highest possible performance ratings, he was one of a few junior officers selected for a Joint Chiefs of Staff Internship, and his supervisors, including senior Naval officers, praised his work. Rear Admiral Lee F. Gunn, for example, stated in an evaluation that Thomasson was "a true 'front runner' who should be groomed for the most senior leadership in tomorrow's Navy."
 
 
 6
 In early March, 1994, soon after reading the Navy message implementing the DoD Directives, Thomasson wrote and presented a letter to four Admirals for whom he served. Noting in the letter that "the time has come when I can remain silent no longer," Thomasson stated "I am gay" and expressed strong disagreement with the military's policy. In accordance with that policy, the Navy initiated separation proceedings against him. In May, 1994, a three-member Board of Inquiry convened and conducted a two day hearing. At the hearing, the Navy conceded that Thomasson had an "enviable" service record. But in seeking his separation, it relied both upon Thomasson's declaration that he was gay and the testimony of one of the Admirals who received the letter. The Navy advised the Board of the congressional findings that supported the Act and the meaning of the military's Directive. Under the Act and Directive, it argued, Thomasson's letter gave rise to a presumption that he had a propensity or intent to engage in homosexual acts which, if unrebutted, warranted separation.
 
 
 7
 For his part, Thomasson presented a copy of his service record, live and written testimony from co-workers who expressed admiration for his capabilities and professionalism, a statement recounting his career and his decision to write the letter announcing that he was gay, and expert testimony on both homosexuality and the meaning of the military's policy. But Thomasson did not, as the district court observed, tender evidence to rebut the presumption that arose from his declaration of homosexuality; that is, he presented no specific evidence on whether he engaged in or had a propensity or intent to engage in homosexual acts. 895 F.Supp. at 823. In fact, Thomasson's statement averred that he would "not go further in degrading myself by disproving a charge about sexual conduct that no one has made." Id. The Navy argued that this defense fell short of rebutting the presumption that arose from Thomasson's declaration of his homosexuality, and therefore that he should be honorably discharged.
 
 
 8
 The Board unanimously found that Thomasson's announcement of his homosexuality gave rise to a presumption of a propensity or intent to engage in homosexual acts and that this presumption had not been rebutted. Because he thus violated Navy policy, Thomasson "failed to demonstrate acceptable qualities of leadership required of an officer in his grade" and the Board recommended that Thomasson be honorably discharged. A three-member Board of Review unanimously upheld this finding, and the Chief of Navy Personnel signed Thomasson's discharge orders. Id. He was scheduled to be separated in February, 1995.
 
 
 9
 Thomasson brought this action in February, 1995, seeking declaratory and injunctive relief to prevent his discharge. The district court preliminarily enjoined Thomasson's discharge pending resolution of his claims. Ultimately, however, the court granted summary judgment for the government. It held that the Act and Directive did not violate equal protection of the laws, the First Amendment, the Due Process Clause or the Administrative Procedure Act. Id. at 831. Thomasson appealed that decision and his subsequent discharge from the Navy. A panel of this court heard argument in September, 1995, and the full court subsequently voted to hear the case en banc.
 
 II.
 
 10
 A court cannot review a case without considering the context in which it arises. We shall explore that context in some detail. We do so out of a belief that this decision implicates in the most fundamental way the role of courts in our democratic system. Separation of powers principles form an integral part of the process of judicial review. To overlook these principles would be as much of an omission as a failure to address the substance of Thomasson's particular constitutional claims.
 
 
 11
 What Thomasson seeks to upset here is a carefully crafted national political compromise, one that was the product of sustained and delicate negotiations involving both the Executive and Legislative branches of our government. While still a candidate, President Clinton expressed an intention to revisit the military's policy on homosexual service members. After he was sworn into office, the President on January 29, 1993, directed the Secretary of Defense to submit to him a draft Executive Order by July, 1993, "ending discrimination on the basis of sexual orientation in determining who may serve in the Armed Forces." Memorandum on Ending Discrimination in the Armed Forces, 1 Pub. Papers 23 (Jan. 29, 1993). The President instructed the Secretary to consult with the Joint Chiefs of Staff, Congress, and concerned individuals in developing the Order; the Order was to be accompanied by a study, which would recommend how the policy revision could be carried out in a way that was "practical, realistic, and consistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain." Id. While this review was underway, an interim policy was put in place which, in part, dictated that new recruits would no longer be questioned about their sexual orientation.
 
 
 12
 The issue quickly generated interest in Congress. In early February of 1993, an amendment was offered in the Senate to the Family and Medical Leave Act to overturn the interim policy by freezing in place the military's pre-existing approach with respect to homosexual service members. 139 Cong. Rec. S1263 (daily ed. Feb. 4, 1993). This effort failed, however, 139 Cong. Rec. S1338-9 (daily ed. Feb. 4, 1993), and the Senate instead adopted a provision calling for a review of the military's policy by the Secretary of Defense and the Senate Armed Services Committee, a review that was to be completed by July, 1993, 139 Cong. Rec. S1263, S1338 (daily ed. Feb. 4, 1993). After House approval, this amendment was enacted into law. Pub.L. 103-3 § 601, 107 Stat. 6, 28-9 (1993).
 
 
 13
 In the first seven months of 1993, both the Executive Branch and Congressional committees engaged in an extensive review of the military's policy. The Senate Armed Services Committee held no less than nine days of hearings, including a field hearing at the Norfolk Naval Complex, taking testimony from nearly fifty witnesses. The House Armed Services Committee held five days of hearings. Witnesses who appeared at these hearings represented a broad range of views and backgrounds. They included: the Secretary of Defense and the Chairman of the Joint Chiefs of Staff; military and legal experts; enlisted personnel, officers and senior military leaders; and activists supporting and opposing the military's policy. See Assessment of the Plan to Lift the Ban on Homosexuals in the Military: Hearings Before the Military Forces and Personnel Subcomm. of the House Comm. on Armed Services, 103d Cong., 1st Sess. (1993) (Assessment of the Plan: House Hearings ); Policy Concerning Homosexuality in the Armed Forces: Hearings Before the Senate Comm. on Armed Services, 103d Cong., 1st Sess. (1993) (Senate Hearings ); Policy Implications of Lifting the Ban on Homosexuals in the Military: Hearings Before the House Comm. on Armed Services, 103d Cong., 1st Sess. (1993) (Policy Implications: House Hearings ).
 
 
 14
 At the same time, the Department of Defense conducted its own exhaustive review. It convened a military working group composed of senior members of each service, commissioned a study by the Rand Corporation, initiated regular consultations with the Joint Chiefs of Staff and leaders of each service, studied the history of the military's response to social change, and consulted legal experts. General Colin N. Powell described the consideration by the Joint Chiefs of Staff in this way: "We have challenged our assumptions. We have argued with each other. We have consulted with commanders at all levels." Assessment of the Plan: House Hearings, at 31.
 
 
 15
 On July 19, 1993, President Clinton announced a new policy on homosexuals in the military developed as a result of the Defense Department's review. The President and Secretary of Defense explained that under the new policy applicants for military service would not be asked or required to reveal their sexual orientation, but once in the service they would be separated for homosexual conduct. 1 Pub. Papers 1111 (July 19, 1993); Senate Hearings, at 705 (Statement of Secretary of Defense, Les Aspin). The Armed Services Committees of the House and Senate then reviewed the policy in detail.
 
 
 16
 In late July, 1993, drawing on the combined wisdom of this exhaustive examination in the Executive and Legislative branches, the House and Senate Armed Services Committees proposed to codify the military's policy on homosexual service members. The Senate stated that its proposal was developed only after the committee considered "a wide range of experiences, including those of current and former servicemembers who have publicly identified themselves as gay or lesbian. The committee received a broad variety of views.... The committee carefully considered all points of view in developing its recommendations." S.Rep. No. 112, 103d Cong., 1st Sess. 270 (1993). Likewise, the House committee reported that its recommendation was based on "an extensive hearing record, as well as a full consideration of the extended public debate on this issue." H.R.Rep. No. 200, 103d Cong., 1st Sess. 287 (1993), reprinted in 1993 U.S.C.C.A.N. 2013, 2074.
 
 
 17
 Before the policy was finally enacted, the full House and Senate undertook a thorough debate of it, and both houses considered amendments on the floor. Each house discussed and rejected companion amendments that, in place of the proposed codification, would have permitted the President and military leaders to develop whatever policy they deemed appropriate. 139 Cong. Rec. S11168-11228 (daily ed. Sept. 9, 1993); 139 Cong. Rec. H7080-84 (daily ed. Sept. 28, 1993). The House also debated and rejected a proposal to require the Defense Department to resume its questioning of new recruits about their sexual orientation. 139 Cong. Rec. H7084-86 (daily ed. Sept. 28, 1993).
 
 
 18
 Both houses ultimately approved the committee proposals. In the words of the Chairman of the Senate Armed Services Committee, the provision was "as fair as we can be to the individuals involved, while, at the same time, maintaining the kind of unit cohesion and military effectiveness that we expect our military services to be able to carry out and perform for the country." 139 Cong. Rec. S11205 (daily ed. Sept. 9, 1993); see also 139 Cong. Rec. H7086-89 (daily ed. Sept. 28, 1993). Finally, the Act was signed by the President on November 30, 1993.
 
 
 19
 What Thomasson challenges, therefore, is a statute that embodies the exhaustive efforts of the democratically accountable branches of American government and an enactment that reflects month upon month of political negotiation and deliberation. Such products of the democratic process are seldom completely tidy or universally satisfactory, but it is precisely on that account that they deserve judicial respect. An Act of Congress reflects a range of views that a judicial decision cannot replicate. Indeed, Justice Holmes admonished that judging the constitutionality of an Act of Congress is "the gravest and most delicate duty" that a court performs. Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927). And "[g]iven the deference due 'the duly enacted and carefully considered decision of a coequal and representative branch of our Government', [this court cannot] lightly second-guess such legislative judgments...." Westside Community Bd. of Ed. v. Mergens, 496 U.S. 226, 251, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (O'Connor, J.) (quoting Walters v. National Assn. of Radiation Survivors, 473 U.S. 305, 319, 105 S.Ct. 3180, 3188, 87 L.Ed.2d 220 (1985)) (other citation omitted).
 
 
 20
 Thomasson requests that we simply set aside these lengthy labors of the legislative process and supplant with our own judicial judgment the product of a serious and prolonged debate on a subject of paramount national importance. This would, however, be a step of substantial gravity. The courts were not created to award by judicial decree what was not achievable by political consensus. Our power to resolve particular controversies carries with it an obligation to respect general solutions. To overturn those solutions in the absence of a clear constitutional mandate would transform the judiciary into an instrument of disenfranchisement for all who use the political process to register the democratic will.
 
 
 21
 The Supreme Court could have been speaking about this very Act when it observed that the question "received considerable national attention and was the subject of wide-ranging public debate [and] was extensively considered by Congress in hearings, floor debate, and in committee." Rostker v. Goldberg, 453 U.S. 57, 72, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981) (sustaining constitutionality of all-male draft registration). Congress has enacted and the President has signed legislation providing that a propensity or intent to engage in homosexual acts is incompatible with the distinctive requirements of military service. This considered judgment on the part of the coordinate branches of our government is one that the third branch has a solemn duty to respect.III.
 
 A.
 
 22
 Thomasson's challenge cannot be viewed apart from the special legal status of military life. The Constitution assigns the conduct of military affairs to the Legislative and Executive branches. There is nothing timid or half-hearted about this constitutional allocation of authority. Rather, the Constitution states fully and directly that the governance of military affairs is a shared responsibility of Congress and the President:
 
 
 23
 The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States....
 
 
 24
 To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;
 
 
 25
 To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;
 
 
 26
 To provide and maintain a Navy;
 
 
 27
 To make Rules for the Government and Regulation of the land and naval Forces;
 
 
 28
 To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;
 
 
 29
 To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;
 
 
 30
 U.S. CONST. art I, § 8.
 
 
 31
 The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States;
 
 
 32
 U.S. CONST. art II, § 2.
 
 
 33
 This constitutional framework was adopted by the Founders in order that our newly christened nation might best defend itself. See Federalist No. 23 (Alexander Hamilton) (Mentor, 1961). As Hamilton explained:
 
 
 34
 The authorities essential to the common defense ... ought to exist without limitation because it is impossible to foresee or to define the extent and variety of national exigencies, and the correspondent extent and variety of the means which may be necessary to satisfy them. The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed.
 
 
 35
 Id. at 153 (emphasis in original). Hamilton believed that this authority should include "any matter essential to the formation, direction, or support of the NATIONAL FORCES." Id. at 154 (emphasis in original).
 
 
 36
 Thus, it is no surprise that the Founders failed to provide the federal judiciary with a check over the military powers of Congress and the President. See U.S. CONST. art III. To do so would have placed, in Hamilton's words, a "constitutional shackle" on the ability of Congress and the President to carry out the duties attendant to national security. Moreover, the virtue of placing military power in the democratic branches was obvious: "[I]f the majority should be really disposed to exceed the proper limits, the community will be warned of the danger [by the minority], and [the community] will have an opportunity of taking measures to guard against it." Federalist No. 26, at 172 (Alexander Hamilton). The federal judiciary--appointed with life tenure--was not regarded as an appropriate repository for such immense power and accordingly was given "no influence over either the sword or the purse." Federalist No. 78, at 465 (Alexander Hamilton).
 
 
 37
 Thus, our Constitution does not authorize the courts to lay and collect taxes to provide for the common defense. The Constitution does not allow the courts to declare war or to raise armies. The judiciary has no authority to make rules for the regulation of military forces. Nor does the Constitution declare the Supreme Court to be the Commander in Chief. By comparison to its predecessors, Article III is a sparse provision, granting no enumerated powers of any kind, but merely jurisdiction "with such Exceptions, and under such Regulations as the Congress shall make." U.S. CONST. art III, § 2.
 
 B.
 
 38
 Because "the Constitution contemplates that Congress has 'plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline,' " Weiss v. United States, 510 U.S. 163, ----, 114 S.Ct. 752, 760, 127 L.Ed.2d 1 (1994) (quoting Chappell v. Wallace, 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983)), the Supreme Court has consistently approached congressional decisions made pursuant to the national security clauses with great respect. In fact, "judicial deference to [a] congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." Rostker, 453 U.S. at 70, 101 S.Ct. at 2655; see also Weiss, 510 U.S. at ---- - ----, 114 S.Ct. at 760-61.
 
 
 39
 The deference mandated by the Constitution has extended to a variety of challenges to Congressional and Executive decisions: Congress' power to order members of the National Guard into service, Perpich v. Department of Defense, 496 U.S. 334, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990); the President's authority as Commander in Chief to "classify and control access to information bearing on national security," Department of the Navy v. Egan, 484 U.S. 518, 527, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988); Congress' decision to require only males to register for the draft, Rostker, 453 U.S. at 57, 101 S.Ct. at 2646; Congress' regulation of the conduct of military personnel under the Uniform Code of Military Justice, Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); and the President's discretion as Commander in Chief to grant a military commission, Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Courts have also held that the question of a war's legality is nonjusticiable. Atlee v. Laird, 347 F.Supp. 689 (E.D.Pa.1972), aff'd summarily sub nom. Atlee v. Richardson, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).
 
 
 40
 Aside from the Constitution itself, the need for deference also arises from the unique role that national defense plays in a democracy. Because our nation's very preservation hinges on decisions regarding war and preparation for war, the nation collectively, as expressed through its elected officials, faces " 'the delicate task of balancing the rights of servicemen against the needs of the military.' " Weiss, 510 U.S. at ----, 114 S.Ct. at 761 (quoting Solorio v. United States, 483 U.S. 435, 447, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987)). To the degree that the judiciary is permitted to circumscribe the national security options of our elected officials, it "decreases the ability of the political branches to impose their will on another [nation and at] the worst, it permits the imposition of the will of another [nation] on the United States." James M. Hirschhorn, The Separate Community: Military Uniqueness and Servicemen's Constitutional Rights, 62 N.C. L.Rev. 177, 237-238 (1983). After all, "[u]nless a society has the capability ... to defend itself from the aggressions of others, constitutional protections of any sort have little meaning." Wayte v. United States, 470 U.S. 598, 612, 105 S.Ct. 1524, 1533, 84 L.Ed.2d 547 (1985).
 
 
 41
 National defense decisions not only implicate each citizen in the most profound way. Such decisions also require policy choices, which the legislature is equipped to make and the judiciary is not. "Congress, working with the Executive Branch, has developed a system of military criminal and administrative law that carefully balances the rights of individual servicemembers and the needs of the armed forces." Sam Nunn, The Fundamental Principles of the Supreme Court's Jurisprudence in Military Cases, 29 Wake Forest L.Rev. 557, 566 (1994). While Congress and the President have access to intelligence and testimony on military readiness, the federal judiciary does not. While Congress and the members of the Executive Branch have developed a practiced expertise by virtue of their day-to-day supervision of the military, the federal judiciary has not. The judiciary has no Armed Services Committee, Foreign Relations Committee, Department of Defense, or Department of State. As the Supreme Court has noted, "the lack of competence on the part of the courts [with respect to military judgments] is marked." Rostker, 453 U.S. at 65, 101 S.Ct. at 2652. In fact,
 
 
 42
 it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.
 
 
 43
 Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973).
 
 
 44
 Finally, the imprimatur of the President, the Congress, or both imparts a degree of legitimacy to military decisions that courts cannot hope to confer. Even when there is opposition to a proposed change--as when Congress abolished flogging in the 19th century or when President Truman ended the military's racial segregation in 1948, see Hirschhorn, 62 N.C. L.Rev. at 243-45--the fact that the change emanates from the political branches minimizes both the likelihood of resistance in the military and the probability of prolonged societal division. In contrast, when courts impose military policy in the face of deep social division, the nation inherently runs the risk of long-term social discord because large segments of our population have been deprived of a democratic means of change. In the military context, such divisiveness could constitute an independent threat to national security.
 
 C.
 
 45
 Parallel to the deference owed Congressional and Presidential policies is deference to the decision-making authority of military personnel who "have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). Judicial interference with the subordinate decisions of military authorities frustrates the national security goals that the democratic branches have sought to achieve.
 
 
 46
 The Supreme Court has recognized the need for deference when facing challenges to a variety of military decisions: a policy that prohibited the wearing of headgear in certain circumstances, Goldman, 475 U.S. at 506, 106 S.Ct. at 1312-13 (noting that the military is "a specialized society separate from civilian society"); an Air Force regulation that required service members to obtain permission before circulating petitions on bases, Brown v. Glines, 444 U.S. 348, 357, 100 S.Ct. 594, 601, 62 L.Ed.2d 540 (1980) (noting that "the military must possess substantial discretion over its internal discipline"); a base policy that prohibited certain political activity on base premises, Greer v. Spock, 424 U.S. 828, 837, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976) (noting "the special constitutional function of the military in our national life"); and military court-martial proceedings, Schlesinger v. Councilman, 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975) (noting that "[t]o prepare for and perform its vital role, the military must insist upon a respect for duty and discipline without counterpart in civilian life").
 
 
 47
 The need for deference also derives from the military's experience with the particular exigencies of military life. Among these is the attainment of unit cohesion--"the subordination of personal preferences and identities in favor of the overall group mission" and "the habit of immediate compliance with military procedures and orders." Goldman, 475 U.S. at 508, 106 S.Ct. at 1313. Should the judiciary interfere with the intricate mix of morale and discipline that fosters unit cohesion, it is simply impossible to estimate the damage that a particular change could inflict upon national security--"there is no way to determine and correct the mistake until it has produced the substantial and sometimes irreparable cost of [military] failure." Hirschhorn, 62 N.C. L.Rev. at 240.
 
 D.
 
 48
 Here the judiciary has been asked in effect to evaluate the appropriate policy regarding homosexuality in the military. The need for circumspection is as real as in the previous military cases decided by the Supreme Court. See Steffan v. Perry, 41 F.3d 677, 686 (D.C.Cir.1994) (en banc). The elected branches have already weighed the contribution that homosexual service members might make against the disruption that homosexual acts and propensities could cause. The particular policy before us is, as we have noted, the product of extensive deliberation on the part of Congress and the President. In the end, alternatives to that policy were rejected because "the maintenance of military unit cohesion--which is the key to combat capability--... must remain paramount over the desires of a single individual or group." H.R.Rep. No. 200, at 2074. To the extent that our renouncement of the accepted policy would require adoption of a rejected one, the damage inflicted by judicial decree on democratic decisionmaking will have been immense.
 
 
 49
 We likewise owe respect to the military's "estimation of the effect of homosexual conduct on military discipline." Steffan, 41 F.3d at 686. This estimation will be made through innumerable personnel decisions informed by the military's assessment of the unique demands of military life. Here, in accordance with military policy, the Navy instituted separation proceedings through a three-member Board of Inquiry, which heard two days of testimony and unanimously voted to honorably discharge Thomasson. The Board of Inquiry's decision was unanimously upheld by a three-member Board of Review, and the Chief of Navy Personnel signed Thomasson's discharge orders. While Thomasson now claims that he successfully rebutted the presumption created by his statement, the military boards found otherwise because Thomasson presented no specific evidence on whether he engaged in or had a propensity to engage in homosexual acts. "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." Bishop v. Wood, 426 U.S. 341, 349, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976); see also Collins v. Harker Heights, 503 U.S. 115, 129, 112 S.Ct. 1061, 1070, 117 L.Ed.2d 261 (1992) ("The Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions' ") (quoting Bishop, 426 U.S. at 350, 96 S.Ct. at 2080). If this is true of state personnel decisions (in Bishop, a police officer fired by a city manager), it should be all the more true in military affairs, where respect for the military's internal personnel system is an essential component of the most fundamental of constitutional pursuits, national security itself.
 
 
 50
 None of this means, of course, that the statute before us may escape constitutional scrutiny. Rather, it is part of the process of constitutional scrutiny to recognize when the Constitution itself requires special deference. Rostker, 453 U.S. at 67, 101 S.Ct. at 2653. In the area of military affairs, the constitutional chartering of popular control is powerfully clear and purposefully redundant. Ultimately, "[t]he special status of the military has required, the Constitution has contemplated, Congress has created, and [the Supreme] Court has long recognized" that constitutional challenges to military personnel policies and decisions face heavy burdens. Chappell, 462 U.S. at 303-04, 103 S.Ct. at 2367-68. It is with those burdens in mind that we address appellant's particular arguments.
 
 IV.
 
 51
 We turn first to Thomasson's contention that the statute, on its face and as applied, contravenes the Fifth Amendment's guarantee of equal protection of the laws. Thomasson claims that the stated justification for this statute--the protection of unit cohesion--is not a legitimate one because it is nothing more than a pretext for prejudice against homosexual service members. He maintains that the means chosen by Congress to promote this statutory purpose are also flawed because they treat declared homosexuals differently from heterosexuals and from homosexuals who decline to declare their sexual orientation.
 
 A.
 
 52
 We address initially Thomasson's effort to invoke heightened judicial scrutiny of this statutory scheme. The searching review that is the hallmark of strict scrutiny is appropriate only in limited cases, where the statute classifies along inherently suspect lines or burdens the exercise of a fundamental constitutional right. Heller v. Doe, 509 U.S. 312, 318-19, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Only a few classifications trigger heightened scrutiny. See, e.g., Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (race subject to strict scrutiny); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944) (national ancestry and ethnic origin subject to strict scrutiny); Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988) (illegitimacy subject to intermediate scrutiny); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 723-24, 102 S.Ct. 3331, 3335-36, 73 L.Ed.2d 1090 (1982) (gender subject to intermediate scrutiny). And because heightened scrutiny requires an exacting investigation of legislative choices, the Supreme Court has made clear that "respect for the separation of powers" should make courts reluctant to establish new suspect classes. Cleburne, 473 U.S. at 441, 105 S.Ct. at 3255; see also Lyng v. Castillo, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986) (declining to extend strict scrutiny to "[c]lose relatives"); Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam) (declining to extend strict scrutiny to the elderly). This reluctance has even more force when the intense judicial scrutiny would be applied to the "specialized society" of the military. Parker, 417 U.S. at 743, 94 S.Ct. at 2555.
 
 
 53
 The statutory classification here is not suspect, nor does it burden any fundamental right. Section 654(b) is aimed at service members who engage in or have a propensity to engage in homosexual acts. A class comprised of service members who engage in or have a propensity or intent to engage in such acts is not inherently suspect. See Steffan, 41 F.3d at 684 n. 3 (classification comprised of persons who engage in acts that the military can legitimately proscribe is not suspect). Similarly, there is no fundamental constitutional right on the part of a service member to engage in homosexual acts and there is a legitimate military interest in preventing the same. Heightened scrutiny of this statute would involve the judiciary in an inventive constitutional enterprise, and it would frustrate the elected branches of government in their efforts to deal with this question. Rational basis is accordingly the suitable standard of review.
 
 B.
 
 54
 It is settled law that rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); see also Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992); United States Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 175, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980). The question is simply whether the legislative classification is rationally related to a legitimate governmental interest. Heller, 509 U.S. at 318-19, 113 S.Ct. at 2642. Under this standard, the Act is entitled to "a strong presumption of validity," id., and must be sustained if " 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification,' " id. at 319-20, 113 S.Ct. at 2642-43 (quoting Beach Communications, 508 U.S. at 307, 113 S.Ct. at 2101). To sustain the validity of its policy, the government is not required to provide empirical evidence. "[A] legislative choice is not subject to courtroom factfinding...." Beach Communications, 508 U.S. at 315, 113 S.Ct. at 2102. Rather, " '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' " Heller, 509 U.S. at 320, 113 S.Ct. at 2643 (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)).
 
 1.
 
 55
 Under these standards, the Act does not violate the equal protection guarantee. Instead, it reflects a legitimate legislative choice. Whether members of the judicial branch agree or disagree with that choice is irrelevant, for the Constitution envisions the rule of law, not the reign of judges. Congress, after months of discussion, concluded that those who engage in or have a propensity to engage in homosexual acts impair military readiness. The Act accordingly observes that the "long-standing" prohibition on homosexual conduct "continues to be necessary in the unique circumstances of military service," 10 U.S.C. § 654(a)(13), and that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability," 10 U.S.C. § 654(a)(15).
 
 
 56
 These judgments reflect in turn Congress' view of military life, which can be, on a round-the-clock basis, "spartan, primitive, and characterized by forced intimacy with little or no privacy." 10 U.S.C. § 654(a)(12). Out of this forced intimacy are forged the bonds that create unit cohesion, which Congress found to be a "critical element[ ]" of combat readiness. 10 U.S.C. § 654(a)(7). In short, "to win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group.... We cannot allow anything to happen which would disrupt that feeling of cohesion within the force." Senate Hearings, at 708 (Statement of Chairman of the Joint Chiefs of Staff, General Colin L. Powell). Military leaders testified time and again how unit cohesion would be undermined: "[I]n my years of military service, I have experienced the fact that the introduction of an open homosexual into a small unit immediately polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war." S.Rep. No. 112, at 280 (Statement of General H. Norman Schwarzkopf).
 
 
 57
 It was legitimate, therefore, for Congress to conclude that sexual tensions and attractions could play havoc with a military unit's discipline and solidarity. It was appropriate for Congress to believe that a military force should be as free as possible of sexual attachments and pressures as it prepared to do battle. Any argument that Congress was misguided in this view is one of legislative policy, not constitutional law. Courts have held that military authorities may discharge those who engage in homosexual acts. Steffan, 41 F.3d at 685 and n. 4; Meinhold v. United States Dept. of Defense, 34 F.3d 1469, 1477 (9th Cir.1994); Ben-Shalom v. Marsh, 881 F.2d 454, 464-65 (7th Cir.1989), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); Dronenburg v. Zech, 741 F.2d 1388, 1398 (D.C.Cir.1984).
 
 
 58
 Given that it is legitimate for Congress to proscribe homosexual acts, it is also legitimate for the government to seek to forestall these same dangers by trying to prevent the commission of such acts. See Steffan, 41 F.3d at 685-86; Ben-Shalom, 881 F.2d at 464. The statements provision, by discharging those with a propensity or intent to engage in homosexual acts, operates in this preventive way. As the Senate Committee described the provision: "[i]t is appropriate for the armed forces to separate the individual from military service without waiting until the individual's propensity or intent ... ripens into specific conduct prejudicial to good order and discipline." S.Rep. No. 112, at 294. This goal is itself a valid one. No constitutional constraint prohibits the military from preventing acts that would threaten combat capability. See Greer, 424 U.S. at 840, 96 S.Ct. at 1218; see also Steffan, 41 F.3d at 689; Ben-Shalom, 881 F.2d at 460-61, 464.
 
 
 59
 The conditions of military life, whether in barracks or aboard ship or in situations of collective peril, may throw service members into situations where sexual tensions are especially unwelcome. S.Rep. No. 112, at 277-80. "Many soldiers experience a forced association 24 hours a day. They work together; they eat together; they share living space together; they train together; they shop for groceries together; they worship together. Same-gender sexual attraction in such a 'forced association' environment is something that civilians rarely experience and cannot fully understand." Senate Hearings, at 762 (Statement of General Gordon Sullivan). Section 654(b) thus accommodates the reasonable privacy concerns of heterosexual service members and reduces the sexual problems that may arise when some members of the unit have a propensity or intent to engage in homosexual acts and others do not. These same concerns for privacy and sexual tension explain the military's policy of providing service men and women with separate living quarters. Id. at 277-78.
 
 2.
 
 60
 Thomasson maintains that the statements provision of § 654(b)(2) is not rationally related to the interests of unit cohesion and protection of sexual privacy, even if those interests could be seen to be legitimate. He argues that it is not rational or permissible to presume that declared homosexuals possess a unique propensity to engage in homosexual acts.
 
 
 61
 We think, however, that the means chosen by Congress in the Act are rationally related to legitimate legislative ends. The presumption that declared homosexuals have a propensity or intent to engage in homosexual acts certainly has a rational factual basis. See Steffan, 41 F.3d at 686; Ben-Shalom, 881 F.2d at 464. In fact, the presumption, which Thomasson was explicitly advised of, represents perhaps the most sensible inference raised by a declaration of one's sexual orientation. As the Senate Committee noted: "It would be irrational ... to develop military personnel policies on the basis that all gays and lesbians will remain celibate...." S.Rep. No. 112, at 284. Although Thomasson argues that some declared homosexuals have not engaged in or do not have a propensity or intent to engage in homosexual acts, "courts are compelled ... to accept a legislature's generalizations even when there is an imperfect fit between means and ends." Heller, 509 U.S. at 312, 113 S.Ct. at 2643. As a general matter, the legislature was certainly entitled to presume that a service member who declares that he is gay has a propensity to engage in homosexual acts. While some service members have rebutted that presumption before military boards of review, see Richenberg v. Perry, 909 F.Supp. 1303, 1313 (D.Neb.1995); Able v. United States, 880 F.Supp. 968, 976 (E.D.N.Y.1995), Thomasson did not demonstrate that he lacked a propensity to engage in homosexual acts. The general evidence offered at his discharge hearing had no bearing on this particular question.
 
 
 62
 Not only is the presumption rational, it is also permissible. Thomasson argues that it is illegitimate to separate him for a mere "propensity" to engage in acts. But in the civil context, the government can fashion general employment policies to prevent unsatisfactory conduct. See New York City Transit Auth. v. Beazer, 440 U.S. 568, 589-92, 99 S.Ct. 1355, 1367-69, 59 L.Ed.2d 587 (1979) (upholding policy barring methadone users from employment); Vance v. Bradley, 440 U.S. 93, 106, 99 S.Ct. 939, 947, 59 L.Ed.2d 171 (1979) (upholding mandatory retirement age for Foreign Service personnel); Massachusetts Bd. of Retirement, 427 U.S. at 314-17, 96 S.Ct. at 2567-69 (upholding mandatory retirement age for police officers). In fact, the statements presumption is a reasonable means of allocating the burden of proof: It places the burden on the party with the most knowledge of the facts (here the military officer), and it frees the military from engaging in detective work. In a civil setting, moreover, "the locus of the burden of persuasion is normally not an issue of federal constitutional moment." Lavine v. Milne, 424 U.S. 577, 585, 96 S.Ct. 1010, 1016, 47 L.Ed.2d 249 (1976) (footnote omitted).
 
 
 63
 Finally, the statute is not, as Thomasson maintains, irrational due to any purported distinction between declared and undeclared homosexuals. The policy instead rationally initiates discharge proceedings when service members, by declaring their homosexuality, thereby provide affirmative evidence to military officials of their propensity or intent to engage in homosexual acts. Thomasson apparently argues that the failure of military authorities to inquire into all service members' propensity to engage in homosexual acts somehow renders the policy unconstitutionally imprecise. But the decision to stop questioning new recruits about their sexual orientation reflects an allocation of military resources and a balance of competing interests, one that does not undermine the basic constitutionality of the Act. Under rational basis review, a classification does not fail because it "is not made with mathematical nicety or because in practice it results in some inequality." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (citation omitted); see Vance, 440 U.S. at 108, 99 S.Ct. at 948.
 
 
 64
 In sum, we conclude that the Act represents a legitimate legislative match of ends and means that withstands appellant's equal protection challenge.
 
 V.
 
 65
 Thomasson also argues that the statute, both on its face and as applied, violates the First Amendment. He was, he contends, separated from the service for doing nothing more than declaring he was gay. According to Thomasson, the statements provision of 10 U.S.C. § 654 thus operates to suppress speech on the basis of its content and viewpoint. It does so, he asserts, by making a specific category of speech--a statement declaring a service member's homosexuality--itself a basis for discharge. As a result, he contends, the provision must serve a compelling governmental interest and must be necessary to promote that interest.
 
 
 66
 Thomasson, however, misinterprets the basic purpose of the policy. The statute does not target speech declaring homosexuality; rather, it targets homosexual acts and the propensity or intent to engage in homosexual acts, and permissibly uses the speech as evidence. The use of speech as evidence in this manner does not raise a constitutional issue--"the First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime," or, as is the case here, "to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489, 113 S.Ct. 2194, 2201, 124 L.Ed.2d 436 (1993); see Dawson v. Delaware, 503 U.S. 159, 165, 112 S.Ct. 1093, 1097, 117 L.Ed.2d 309 (1992); Wayte, 470 U.S. at 610-14, 105 S.Ct. at 1532-34. Discriminatory words often provide the basis for challenges to discriminatory acts under Title VII, for instance, see Price Waterhouse v. Hopkins, 490 U.S. 228, 251-52, 109 S.Ct. 1775, 1791-92, 104 L.Ed.2d 268 (1989) (plurality opinion), yet employers enjoy no First Amendment right to keep those words out of court. See R.A.V. v. City of St. Paul, 505 U.S. 377, 389, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992) (observing that "sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices").
 
 
 67
 There is no constitutional impediment, therefore, to the use of speech as relevant evidence of facts that may furnish a permissible basis for separation from military service. No First Amendment concern would arise, for instance, from the discharge of service members for declaring that they would refuse to follow orders, or that they were addicted to controlled substances. Such remarks provide evidence of activity that the military may validly proscribe. And, as we discussed above, the military may take measures to prevent the commission of sexual activity that it deems detrimental to its mission. Based upon this rationale, courts have consistently rejected First Amendment challenges to the use of a service member's declaration of homosexuality as a basis for separation. See Pruitt v. Cheney, 963 F.2d 1160, 1163-64 (9th Cir.1991), cert. denied, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992); Schowengerdt v. United States, 944 F.2d 483, 489 (9th Cir.1991), cert. denied, 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992); Ben-Shalom, 881 F.2d at 462. A declaration of homosexuality, "like most admissions, [is] made in speech," noted one such court, "but that does not mean that the first amendment precludes the use of the admission as evidence of the facts admitted." Pruitt, 963 F.2d at 1164.
 
 
 68
 Thomasson asserts, however, that this reasoning is not applicable to the new policy. He points to language in the DoD Directive stating that "sexual orientation is considered a personal and private matter" and "is not a bar to continued service." DoD Dir. 1332.30, Enc. 2 p C, at 2-1. He infers from this language that speech disclosing one's homosexuality admits to nothing unlawful, and hence lacks any evidentiary value. According to Thomasson, the policy thus at bottom distinguishes declared homosexuals from undeclared homosexuals, penalizing only the former on the basis of their speech.
 
 
 69
 While imaginative, Thomasson's argument fails to alter our conclusion that the new policy is in fact directed at the propensity or intent of service members to engage in homosexual acts, and uses speech declaring homosexuality as evidence thereof. First, Thomasson's charge that such a declaration lacks any evidentiary value is patently erroneous. As we explained in rejecting Thomasson's equal protection challenge, a service member's statement that he is a homosexual has substantial evidentiary value regarding whether he has a propensity to engage in homosexual acts--"the military may reasonably assume that when a member states that he is a homosexual, that member means that he either engages or is likely to engage in homosexual conduct." Steffan, 41 F.3d at 686; see Ben-Shalom, 881 F.2d at 464.
 
 
 70
 Second, the statutory provision does not at its core distinguish between declared and undeclared homosexuals, the central premise of Thomasson's First Amendment argument. Instead, it distinguishes service members who have a propensity or intent to engage in homosexual acts from other members, and uses a declaration of homosexuality as evidence. The statute's operation confirms as much. Service members who state that they are homosexual can avoid separation by rebutting the presumption that they have a propensity or intent to engage in homosexual acts. 10 U.S.C. § 654(b)(2); DoD Dir. 1332.30, Enc. 2 p C.1.b., at 2-2. Although Thomasson chose not to come forward with evidence in this regard, other members subject to discharge under the statements provision have successfully demonstrated that they lack a propensity or intent to engage in homosexual acts. See Richenberg, 909 F.Supp. at 1313; Able, 880 F.Supp. at 976.
 
 
 71
 Moreover, service members who have never spoken about their sexual orientation are still subject to separation if they are found to have engaged or attempted to engage in homosexual acts. 10 U.S.C.s 654(b)(1); DoD Dir. 1332.30. Enc. 2 p C.1.a., at 2-2. In a similar vein, service members who have not publicly declared their homosexuality are nevertheless subject to discharge if they have made private statements to that effect, when those statements are brought to the attention of commanding officers and the evidence regarding any such private statement is credible. See S.Rep. No. 112, at 291-92. Again, the statute's essential concern is not with speech declaring homosexuality, as Thomasson alleges, but is instead with the propensity or intent to engage in acts which Congress has deemed detrimental to the military's mission.
 
 
 72
 Because the statute aims at this propensity, not at speech, it is not a viewpoint-based or content-based regulation. With respect to the former, the statute's treatment of a declaration of homosexuality is not based on a desire to suppress any viewpoint that the statement might convey. The declaration asserts a fact, one that the military uses as evidence of a propensity or intent to engage in homosexual acts. The military, however, allows service members to express views on issues that affect homosexuals. As the district court found, members are "free to affiliate with a group that opposes the policy, to make statements criticizing the policy, to attend demonstrations in favor of homosexual rights, to read homosexual newspapers, or engage in other such expressive activities." 895 F.Supp. at 825; see DoD Dir. 1332.30, Enc. 8, p C.3.d., at 8-2; see also Assessment of the Plan: House Hearings, 35-37 (Statement of Gen. Colin Powell).
 
 
 73
 The statute likewise does not discriminate on the basis of the content of speech. Whenever a provision prohibits certain acts, it necessarily chills speech that constitutes evidence of the acts. A regulation directed at acts thus inevitably restricts a certain type of speech; this policy is no exception. But effects of this variety do not establish a content-based restriction of speech. In Wayte v. United States, for example, the Supreme Court rejected a First Amendment challenge to the government's policy of prosecuting only those violators of draft registration laws who either reported themselves or were reported by others. 470 U.S. at 610-14, 105 S.Ct. at 1532-34. The petitioner, Wayte, alleged that the policy "inevitably created a content-based regulatory system" with a "content-based impact on non-registrants" such as himself. Id. at 611, 105 S.Ct. at 1532. But the Supreme Court treated the policy as a content-neutral regulation, observing that letters informing the government of an intent not to obey conscription requirements "provided strong, perhaps conclusive evidence of the nonregistrant's intent not to comply--one of the elements of the offense." Id. at 612-13, 105 S.Ct. at 1533.
 
 
 74
 A regulation is thus "content-neutral so long as it is 'justified without reference to the content of the regulated speech,' " even if it has an "effect on some speakers or messages but not others." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (citations omitted) (emphasis in original). For instance, the Supreme Court deemed to be content-neutral an ordinance that distinguished adult film theaters from other kinds of theaters, as the regulation was "aimed not at the content of the films" but at the "effects of such theaters on the surrounding community." City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (emphasis in original). The civil rights laws also penalize a specific type of speech in certain contexts--speech expressing discriminatory views--yet the Supreme Court regards Title VII "as an example of a permissible content-neutral regulation." Mitchell, 508 U.S. at 487, 113 S.Ct. at 2200; see R.A.V., 505 U.S. at 388, 112 S.Ct. at 2546. The military policy here is justified on a content-neutral, nonspeech basis: preventing the disruptions that homosexual activity among service members might have on military readiness. That the policy may hinge the commencement of administrative proceedings on a particular type of statement does not convert it into a content-based enactment. See Wayte, 470 U.S. at 610-14, 105 S.Ct. at 1532-34.
 
 
 75
 Thomasson's constitutional challenge faces yet another hurdle. Members of the armed services have never possessed all the First Amendment rights of the civilian population. Rather, the Supreme Court has made clear that special First Amendment considerations surround the military environment. The Supreme Court has characterized its "review of military regulations challenged on First Amendment grounds" as "far more deferential than constitutional review of similar laws or regulations designed for civilian society." Goldman, 475 U.S. at 507, 106 S.Ct. at 1313. In Brown v. Glines, for instance, the Supreme Court upheld against a First Amendment challenge Air Force regulations that required service members to obtain permission from their base commanders before circulating petitions, noting that " '[s]peech that is protected in the civil population may ... undermine the effectiveness of response to command.' " 444 U.S. at 354, 100 S.Ct. at 599 (citations omitted). In general, the Court observed, "while members of the military services are entitled to the protections of the First Amendment, 'the different character of the military community and of the military mission requires a different application of those protections.' " Id. (quoting Parker, 417 U.S. at 758, 94 S.Ct. at 2563).
 
 
 76
 Finally, even with respect to non-military public employment, government may restrict certain types of speech to promote the effective performance of its function. See Waters v. Churchill, --- U.S. ----, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In such cases, courts must give "full consideration" to "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150, 103 S.Ct. at 1692. Indeed, "where the government is employing someone for the very purpose of effectively achieving its goals," restrictions on speech "may well be appropriate." Waters, --- U.S. at ----, 114 S.Ct. at 1888 (plurality opinion). Congress expressly found that the statute at issue here was justified on grounds relating to performance of the military function, perhaps the most important of all governmental responsibilities. 10 U.S.C. § 654(a)(15). For the same reasons we identified in rejecting Thomasson's equal protection claim, the use of statements of one's homosexuality as evidence of a propensity or intent to engage in homosexual acts is justifiable under the standards associated with content-neutral military rules, see Glines, 444 U.S. at 354-55, 100 S.Ct. at 599600, and as an allowable means of furthering the nation's military mission.
 
 VI.
 
 77
 In a final series of catch-all claims, Thomasson alleges that the Act violates basic guarantees of due process and procedural fairness conferred by the Constitution and the Administrative Procedure Act. 5 U.S.C. §§ 551 et. seq. First, he contends that it is irrational to presume that one who states that he is a homosexual engages in or has a propensity or intent to engage in homosexual acts. Second, he maintains that the presumption is rebuttable only in theory, and is irrebuttable in practice. Finally, he alleges that his discharge was arbitrary and capricious and unsupported by substantial evidence.
 
 
 78
 We have already rejected much of the substance of these allegations in our discussion of Thomasson's equal protection and First Amendment claims. The policy's rebuttable presumption is entirely rational, as we have explained in ruling on Thomasson's equal protection challenge. The proceedings complied with any requirements imposed by the Administrative Procedure Act--Thomasson received a full and adequate hearing in which substantial evidence established that he stated that he was a homosexual and that he failed to rebut the presumption triggered thereby. See Thomasson, 895 F.Supp. at 831. In short, Thomasson's claims that his discharge violated due process and the Administrative Procedure Act are without merit.
 
 VII.
 
 79
 We have carefully reviewed Thomasson's various claims, but we cannot accept them. To do so would not only overturn the efforts of the elected branches of government to resolve a significant question of national military policy. It would also violate much plain and settled Supreme Court precedent. In the end, the best service courts can render is to return this debate to where it all began--to the halls of democratic governance, where the many Americans affected by decisions such as these can participate directly in their resolution.
 
 
 80
 The judgment of the district court is hereby affirmed.
 
 
 81
 AFFIRMED.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 82
 I concur. Because an extended discussion of judicial deference to the military is unnecessary, I would dispose of the matter much more simply. The case concerns a rebuttable presumption which Thomasson did not rebut. Whether the employer was a military or nonmilitary body, it is enough that the presumption used is rational and thus constitutional.
 
 LUTTIG, Circuit Judge, concurring:
 
 83
 The statute governing homosexuals in the Armed Services that was enacted by the Congress of the United States and signed by the President forbids known homosexuals from serving in the military. As Lt. Thomasson has steadfastly maintained, the statute, and the policy it embodies, is not at all conduct-based in the sense now argued by the Executive Branch, assertedly on behalf of the Congress. The statute requires the discharge of homosexual service members who merely say that they are homosexual or otherwise evidence their homosexuality, regardless of whether they have actually engaged in homosexual conduct or are likely to engage in any such conduct.
 
 
 84
 The requirement that, in order to be discharged, one must at least demonstrate a likelihood to engage in homosexual acts exists only in a regulation promulgated by the Administration, ostensibly in implementation of the statute. That regulation redefines the statutory term "propensity" so that only those homosexual service members who are likely to engage in homosexual acts will be discharged. Through this regulation the Administration has effectively secured the very policy regarding military service by homosexuals that it was denied by the Congress.
 
 
 85
 Rather than continue to indulge the politically expedient fiction that the congressionally-mandated policy bars from service only those known homosexuals who are likely to engage in homosexual acts--a fiction that both of these parties urge upon us because it serves their mutual interest in creating a sanctuary for homosexuals within the military--I would simply invalidate the Administration's regulation as in excess of its statutory authority. Then, having done so, I would sustain the policy that was actually enacted into law as a permissible exercise of Congress' constitutional authority "To make Rules for the Government and Regulation" of the military. U.S. Const. Art. I, § 8, cl. 14. As the Solicitor General maintained at argument, and as the courts have uniformly held in analogous contexts, it is well within the plenary authority of the Congress to exclude homosexuals from military service because of the deleterious effects that knowledge of their attraction for members of the same sex has on unit cohesion and military effectiveness.
 
 
 86
 The Administration stridently argues that the question of the validity of the regulation is not before us. Thomasson, however, unequivocally draws into question the validity of the regulation through his argument that, despite the conduct-based regulation, the military's policy is status-based:
 
 
 87
 The [Family Research] Council asserts that the Department of Defense and Navy regulations at issue in this case conflict with the Congressional intent of the statute that is also at issue.... In support of its motion, the Council asserts that the parties have overlooked this point. In fact, however, this point was raised in Lt. Thomasson's brief and was extensively addressed by both parties at the prior argument in this appeal. See, e.g., Brief for Appellant, at 45 n. 47, 45-49.
 
 
 88
 Appellant's Resp. to Mot. of Amicus Curiae Family Research Council for Leave to Participate in Oral Argument at 2 & n. 1 (emphasis added). And the Administration defends its policy entirely on the grounds that the regulation is the source of the conduct-based rationale for the policy. Thus, both parties clearly believe that the constitutionality of the "Don't Ask; Don't Tell" policy turns upon the regulatory redefinition of "propensity" to mean a likelihood of future conduct.
 
 I.
 
 89
 For as long as it has had a military, the United States has excluded homosexuals from military service. During the 1992 election campaign, then-Governor Clinton said that, if elected, he would repeal this long-standing ban on homosexuals, see S.Rep. No. 112, 103d Cong., 1st Sess. 267 (1993), and, true to his promise, slightly more than a week after assuming office President Clinton announced in his first press conference that he was directing Secretary of Defense Aspin to prepare an Executive Order "ending discrimination [in the military] on the basis of sexual orientation." Memorandum on Ending Discrimination in the Armed Forces, 1 Public Papers of the Presidents, William J. Clinton, Jan. 29, 1993, at 23 ("Pub.Papers"); see also J.A. at 335.[1] During this press conference, see The President's News Conference, 1 Pub. Papers 20, 21 (Jan. 29, 1993), President Clinton embraced as consistent with his own views the distinction between homosexual status and homosexual conduct drawn by the federal District Court for the Central District of California in a decision that had been rendered only the previous day. See Meinhold v. United States Department of Defense, 808 F.Supp. 1455, 1458 (C.D.Cal.1993), aff'd in part and vacated in part, 34 F.3d 1469 (9th Cir.1994). In Meinhold, the district court had enjoined the Department of Defense from discharging homosexuals based on sexual orientation, absent any evidence of homosexual conduct.
 
 
 90
 A political firestorm erupted over the President's announced plans to lift the ban on homosexuals. Congress, for its part, convened hearings to consider the effect that the President's proposed elimination of the ban would have on military capability. It also created a Military Working Group to consider the President's proposal, which, on July 1, 1993, released a report concluding that "the presence of open homosexuals in a unit would, in general, polarize and fragment the unit and destroy the bonding and singleness of purpose required for effective military operations." Summary Report of the Military Working Group 5 (July 1, 1993) (emphasis added).
 
 
 91
 Despite the conclusion of the Military Working Group that the mere presence of homosexuals would detrimentally affect unit cohesion, the "Policy on Homosexual Conduct in the Armed Forces" transmitted by Secretary Aspin to the Secretaries of the Army, Navy and Air Force and to the Chairman of the Joint Chiefs of Staff on July 19, 1993, provided as follows:
 
 
 92
 [I]t is the policy of the Department of Defense to judge the suitability of persons to serve in the armed forces on the basis of their conduct. Homosexual conduct will be grounds for separation from the military services. Sexual orientation is considered a personal and private matter, and homosexual orientation is not a bar to service entry or continued service unless manifested by homosexual conduct.
 
 
 93
 Memorandum from The Secretary of Defense, July 19, 1993, at 1 ("July 19th Memorandum"), reprinted in Assessment of the Plan to Lift the Ban on Homosexuals in the Military: Hearings Before the Military Forces and Personnel Subcomm. of the House Comm. on Armed Services, 103rd Cong., 1st Sess. 22 (1993) (H.A.S.C. No. 103-19). At a press conference that same day, President Clinton himself announced the new policy, explaining that "service men and women [under the new policy] will be judged based on their conduct, not their sexual orientation," and suggesting strongly that known homosexuals could remain in military service provided they did not engage in conduct violative of the Uniform Code of Military Justice. Remarks Announcing the New Policy on Homosexuals in the Military, 1 Pub. Papers 1109, 1111 (July 19, 1993); see id. at 1109 ("[The new policy] provides greater protection to those who happen to be homosexual and want to serve their country honorably in uniform, obeying all the military's rules against sexual misconduct." (emphasis added)).
 
 
 94
 Concerned that the new policy as described by the President would allow open homosexuals to serve in the military, Congress questioned Administration officials at length on the precise meaning of the new policy, enacting the legislation that we now have before us only after it was convinced that the new policy would retain the ban on service by homosexuals. See, e.g., S.Rep. No. 112 at 289 ("Based upon the testimony [by Secretary Aspin, the Joint Chiefs of Staff, the General Counsel of the Department of Defense, and the Military Working Group] received at the hearing, the committee finds that the Department of Defense has retained the central features of its policy concerning homosexuality in the armed forces," namely, "mandatory discharge" for "homosexual acts, marriages, and statements that demonstrate a propensity to engage in homosexual acts."). Congress thus codified the long-standing ban against service by homosexuals, 10 U.S.C. § 654, adopting in an uncodified "sense of Congress" provision the President's interim policy ceasing the questioning of new recruits about their sexual orientation. National Defense Authorization Act for Fiscal Year 1994, Pub.L. No. 103-160, § 571(d)(1), 107 Stat. 1547, 1673 (1993). Even so, Congress included a proviso that the Secretary of Defense could reinstate the questioning of new recruits if, in the Secretary's view, such ultimately proved necessary to implement the statutory ban on service by known homosexuals. See id.[2]
 
 
 95
 It is this statutory policy enacted by Congress, not the policy advocated by President Clinton in January 1993 or the policy implemented by the Secretary through regulation, that was signed into law on November 30, 1993.
 
 II.
 A.
 
 96
 Section 571(a) of the National Defense Authorization Act for Fiscal Year 1994, 10 U.S.C. § 654, like the pre-1993 Department of Defense Directives it codifies, unambiguously prohibits all known homosexuals from serving in the military, regardless of the likelihood that they will violate the Uniform Code of Military Justice prohibition against sodomy, see Article 125, U.C.M.J., 10 U.S.C. § 925, or engage in other homosexual acts as defined by the statute, see 10 U.S.C. § 654(f)(3).[3] The statute defines "homosexual" as "a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." Id. at § 654(f)(1). It then provides that a service member who states that he is homosexual (or otherwise evidences his homosexuality)[4] shall be separated from service unless he demonstrates that he is not, as statutorily defined, a "homosexual":
 
 
 97
 A member of the armed forces shall be separated ... if [inter alia ] ... the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless ... the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.
 
 
 98
 Id. at § 654(b)(2) (the "statements" provision). The presumption that one is homosexual which arises from one's statement of homosexuality, in other words, can be rebutted only by proving that one does not even have a propensity to engage in homosexual acts. See S.Rep. No. 112 at 294 ("[O]nce the government introduces evidence that the member has stated that he or she is a homosexual, the burden shifts to the member ... to demonstrate that he or she is not a homosexual as defined in the statute."); id. ("[T]he member bears the burden of persuading the fact-finder by a preponderance of the evidence that the rebuttal is more credible than the original statement (e.g., by proving that the original statement was made in jest).").[5] The statute in this manner bars service not just of those individuals likely to engage in homosexual acts, but rather, of all acknowledged (or otherwise known) homosexuals. That the statute is aimed at known homosexuals, rather than homosexual acts, is further confirmed by the fact that, pursuant to section 654(b)(1), a heterosexual who actually engages in homosexual acts is not barred from service if he demonstrates inter alia that he is not a homosexual.[6]
 
 
 99
 In barring all known homosexuals from military service, the statute is identical to the pre-1993 DoD policy:Homosexuality is incompatible with military service.... A member shall be separated ... if ... [t]he member has stated that he or she is a homosexual or bisexual unless ... the member is not a homosexual or bisexual.
 
 
 100
 DoD Directive 1332.14 (March 9, 1982), reprinted in 32 C.F.R. Ch. 1, Pt. 41, App. A, pp H.1.a. and H.1.c. (2) (1994). Indeed, in the following colloquy with Senator Nunn during the Senate hearings on the "Don't Ask; Don't Tell" policy, the General Counsel for the Department of Defense, Jamie Gorelick, confirmed that the current policy is the same as the prior policy in this critical respect:
 
 
 101
 CHAIRMAN NUNN. Under [the pre-1993] DoD policy, if there is a finding that an individual has stated that he or she is homosexual, that person is discharged unless there is further finding that the individual is not, in fact, homosexual, that is, the person does not engage in homosexual acts or have an intent or desire to do so. Is that correct?
 
 
 102
 MS. GORELICK. That is correct.
 
 
 103
 ...
 
 
 104
 CHAIRMAN NUNN. In other words, the [pre-1993] policy establishes a rebuttable presumption that a person who says he or she is homosexual is, in fact, homosexual. Is that correct?
 
 
 105
 MS. GORELICK. That is what the current policy does. And, as the Secretary says, that is carried forward into the new policy.
 
 
 106
 S. Hrg. 103-845 at 771 (emphasis added). Secretary Aspin also affirmed that the policy disqualifies from service all known homosexuals, agreeing in response to questions from Senator Gramm that, under the policy, military personnel "would at least be assured that no one would be a self-professed homosexual and be allowed to continue to serve." Id. at 727; see also id . at 746-47 (Secretary Aspin confirming that the rebuttable presumption in the current policy is the same as that in the prior policy).
 
 
 107
 The fact that the statute excludes known homosexuals from service because they are homosexual and not only because they engage in homosexual acts is reinforced in the statutory findings made by Congress:
 
 
 108
 The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts [--that is, of "homosexuals," as statutorily defined--] would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.
 
 
 109
 10 U.S.C. § 654(a)(15) (emphasis added); see also S.Rep. No. 112 at 293 ("The [legislative] findings reflect long standing Department of Defense policy, as set forth in [the pre-1993] DoD Directive[s], that '[h]omosexuality is incompatible with military service ... [because the] presence in the military environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission.' "); H.R.Rep. No. 200, 103d Cong., 1st Sess. 287 (1993), reprinted in 1993 U.S.Code Cong. & Admin. News 2013, 2074 ("[T]he committee concludes that homosexuality is incompatible with military service.").[7]
 
 
 110
 And there is abundant support for this statutory finding in the legislative record. See, e.g., S.Rep. No. 112 at 278 (testimony of General Colin Powell); id. at 280 (testimony of General H. Norman Schwarzkopf); S. Hrg. 103-845 at 780 (testimony of General John Otjen); MWG Summary Report at 5; see generally Able, 880 F.Supp. at 977 (describing the disruptive effect to unit cohesiveness caused by the mere presence of homosexuals in the military as "a theme repeatedly stated by high-ranking officers").
 
 
 111
 Thus, the "Don't Ask; Don't Tell" policy enacted into law, as opposed to the policy that has been put in place by the Administration, is not conduct-based in the constitutionally significant sense that homosexuals may only be discharged based upon their commission of homosexual acts or their likelihood to commit such acts, or even in the sense that its purpose is to prevent homosexual conduct before it occurs. As Lt. Thomasson correctly observes, this "focus on conduct [is but] a lawyer-driven, pretextual afterthought" by the Administration. Appellant's Br. at 26; see also Able, 880 F.Supp. at 977 ("[T]he lawyers evolved the Byzantine and complex [regulatory] provisions" in order "to pretend that the concern was [not over] the mere presence of homosexuals in the Services, but [over] their potential acts."). Compare Gov't Br. at 23 ("Thomasson's repeated assertion that the policy classifies on the basis of homosexual orientation cannot be reconciled with the plain regulatory language that equates 'propensity' with 'likelihood.' " (citations omitted) (emphasis added)).
 
 
 112
 The statutory policy is "conduct-based" (if it can be so characterized at all) only in the sense that the service member must evidence his homosexual propensity in some manner, if only by a statement, before he will be discharged. See DoD Directive 1332.30, Encl. 1, p 9, Encl. 2, p C, and Encl. 6, p B.4 (March 4, 1994) (defining "homosexual conduct" so as to include "statements"); MWG Summary Report at 4 (same); S.Rep. No. 112 at 289 (same); see also S. Hrg. 103-845 at 817 (testimony of Jamie Gorelick) ("[W]hen we talk about separating status from conduct, we are talking about separating orientation from homosexual acts, statements, and marriages." (emphasis added)); id. at 807 (testimony of Jamie Gorelick) ("[T]he policy has always been defended on the basis that it is homosexual conduct--acts, statements, and marriages--that is the basis of discharge under the current policy." (emphasis added)). Such a policy is, as between pure status and pure conduct, a status-based policy, because it merely recognizes certain conduct as evidence of homosexuality; it does not exclude on the basis of that conduct itself. To say that the policy is status-based in this sense, as opposed to conduct-based in the sense argued by the Administration, of course, is not to say that the policy is status-based in the same way that an exclusion on the basis of an immutable characteristic would be. Rather, it is to say that the policy is based upon what is in fact a hybrid of status and conduct, namely, "propensity." "Propensity" is different from a predetermined and immutable characteristic like race or sex, in that it is a disposition toward certain conduct; but it is also different from conduct itself, or its likelihood, because it is neither itself action nor necessarily indicative of likely future action. It is, as commonly understood, merely an inclination, see infra, and it is that inclination, that propensity, not any likelihood of conduct, at which this particular policy is directed.
 
 
 113
 That the enacted policy is conduct-based only in the sense that there must be some manifestation of one's homosexuality should not be surprising. The whole of the compromise between the Congress and the President was that the military would no longer question a new recruit or service member about his sexual orientation absent some manifestation by him of homosexuality, but that discharge would be mandated if a service member evidenced his homosexuality in any way at all--through even as little as a statement--unless he could prove that he was not homosexual. Thus, the policy: "Don't Ask, Don't Tell."
 
 B.
 
 114
 The Administration fully understands that the policy enacted by Congress is not conduct-based in the sense that it is targeted at homosexual acts and the likelihood that one will commit such acts, as evidenced by its repeated mischaracterization of the statute itself and its effective misquotation of the testimony of the various witnesses and legislators on this important if not dispositive issue. On virtually every occasion when the Administration references either a statutory provision or a passage from testimony wherein Congress or a witness observed that the presence of open homosexuals would be detrimental to combat capability or unit cohesion, it substitutes its regulatory definition of "propensity" (i.e., a likelihood that one will engage in homosexual acts) for the words actually enacted or spoken.
 
 
 115
 The Administration states, for example, that,
 
 
 116
 [t]he classification here is directed at homosexual "acts and the likelihood of acts" and is grounded in the congressional finding that the presence in the military of persons who engage in, or are likely to engage in, such acts "would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. 654(a)(15).
 
 
 117
 Gov't Br. at 16-17 (emphasis added). In fact, the statutory finding referenced by the Administration in this passage is not that an unacceptable risk would be created by the presence of persons likely to engage in homosexual acts; rather, the finding is that the risk would be created by "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts." 10 U.S.C. § 654(a)(15).
 
 
 118
 Similarly, the Administration describes General Powell's Senate testimony in this way:
 
 
 119
 In General Powell's experience, service by persons who engage in, or are likely to engage in, homosexual acts, "would have an unacceptable detrimental and disruptive impact on the cohesion, morale, and esprit of the armed forces." S.Rep. 112 at 278. See also id. at 281.
 
 
 120
 Gov't Br. at 37 (emphasis added); see also id. at 3 (same). General Powell actually stated not that the service of persons likely to engage in homosexual acts would be detrimental to unit cohesion, but rather that,
 
 
 121
 the presence of open homosexuality would have an unacceptable detrimental and disruptive impact on the cohesion, morale, and esprit of the armed forces.
 
 
 122
 S.Rep. No. 112 at 278 (emphasis added).
 
 
 123
 Repeating the mischaracterization, the Administration recites again, later, that "General Powell stated that 'it would be prejudicial to good order and discipline' if the military required heterosexuals and persons who do, or are likely to, engage in homosexual acts 'to share the most private facilities together, the bedroom, the barracks, latrines, and showers.' " Gov't Br. at 38 (quoting from S.Rep. No. 112 at 283) (emphasis added). General Powell actually stated:
 
 
 124
 [I]t is very difficult in a military setting, where you don't get a choice of association, where you don't get a choice of where you live, to introduce a group of individuals who are proud, brave, loyal, good Americans, but who favor a homosexual life style, and put them in with heterosexuals who would prefer not to have somebody of the same sex find them sexually attractive, put them in close proximity, [and] ask them to share the most private facilities together, the bedroom, the barracks, latrines, and showers.
 
 
 125
 I think that it is a very difficult problem to give the military. I think it would be prejudicial to good order and discipline to try to integrate that in the current military structure.
 
 
 126
 S.Rep. No. 112 at 283 (emphasis added); see also Appellant's Reply Br. at 13 ("[The government has] simply and repeatedly misrepresented General Powell's testimony in an effort to suggest [that the policy is based on conduct, not on mere acknowledgements of sexual orientation, irrespective of conduct].").
 
 
 127
 The Administration misrepresents General Schwarzkopf's testimony in the same manner. It apprises the court that,
 
 
 128
 General Schwarzkopf similarly testified, based on his consistent experience over years of military service, that the presence of such homosexuals [viz., "persons who engage in, or are likely to engage in, homosexual acts"] in a military unit "polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war." [S.Rep. 112] at 280.
 
 
 129
 Gov't Br. at 37 (emphasis added). General Schwarzkopf actually stated:
 
 
 130
 [I]n my years of military service, I have experienced the fact that the introduction of an open homosexual into a small unit immediately polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war.
 
 
 131
 S.Rep. No. 112 at 280 (emphasis added).
 
 
 132
 Likewise, the Solicitor General says that General Schwarzkopf testified that, "where such homosexuals [again, those who either engage in or are likely to engage in homosexual acts] served in military units, 'morale broke down, and unit effectiveness suffered,' " Gov't Br. at 37 (emphasis added), when in fact General Schwarzkopf testified that, "in every case [he was] familiar with, ... whenever it became known in a unit that someone was openly homosexual, polarization occurred, violence sometimes followed, morale broke down, and unit effectiveness suffered." S.Rep. No. 112 at 280 (emphasis added).
 
 
 133
 Such mischaracterization appears repeatedly throughout the government's submissions.
 
 
 134
 It is self-evident that this mischaracterization is purposeful. The deliberateness of the mischaracterization is also borne out, however, by the fact that when the Administration responded to congressional leaders whom it knew to be opposed to its position on military service by homosexuals, it substituted the statutory language for the regulatory language, rather than the regulatory language for the statutory language as it does before this court. Senators Thurmond, Nunn and Coats, on behalf of the Senate's Committee on Armed Services, asked the Department's General Counsel "[h]ow ... the implementing directives and related guidance address ... [t]he circumstances in which a person who states that he or she is a homosexual claims that the rules preclude separation of anyone based on their 'sexual orientation.' " Letter from DoD General Counsel Judith A. Miller to Senators Thurmond, Nunn and Coats 1, 2 (July 27, 1995) (reciting questions from Thurmond, Nunn and Coats letter of July 13, 1995). When DoD answered this question, it did so with what is almost a verbatim quotation from its regulation, altered only so as to substitute the statutory language for the final clause of the regulation, which refers to the possibility of rebuttal through proof that one is not likely to engage in homosexual acts. The regulation provides, of course, that,
 
 
 135
 [i]n determining whether a member has successfully rebutted the presumption that he or she engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts, some or all of the following may be considered: (a) Whether the member has engaged in homosexual acts; (b) The member's credibility; (c) Testimony from others about the member's past conduct, character and credibility; (d) The nature and circumstances of the member's statement; [and] (e) Any other evidence relevant to whether the member is likely to engage in homosexual acts.
 
 
 136
 DoD Directive 1332.14, Enc. 3, Att. 1, p H.1.b. (2) (March 4, 1994) (emphasis added). The Department of Defense General Counsel, however, replied to the Senators as follows:
 
 
 137
 In determining whether a Service member has successfully rebutted the presumption, a Board may consider, among other evidence: whether the member has engaged in homosexual acts; the member's credibility; testimony from others about the member's past conduct, character and credibility; the nature and circumstances of the statement; and any other evidence relevant to whether the member engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.
 
 
 138
 Letter from DoD General Counsel Judith A. Miller to Senators Thurmond, Nunn and Coats 3 (July 27, 1995) (emphasis added).
 
 III.
 
 139
 Despite Congress' clear mandate requiring the discharge of all known homosexuals, the Department of Defense has, by its regulatory redefinition of the statutory term "propensity," created what is in effect a sanctuary for known homosexuals whom the military determines are not likely to engage in homosexual acts. See Gov't Br. at 27 ("Both on the face of the policy and in actual practice, the rebuttable presumption allows a service member who has stated that he is homosexual an opportunity to be retained in the service by showing that he does not engage in, and is not likely to engage in, homosexual acts.").[8] Because it is unmistakable that, under the statute enacted by Congress, such homosexuals may not remain in service of the military, I would invalidate this regulation as an impermissible exercise of the regulatory authority conferred upon the Secretary.
 
 A.
 
 140
 The regulation promulgated by the Secretary defines the statutory phrase "propensity to engage in homosexual acts" to mean "a likelihood" that one will engage in homosexual acts:
 
 
 141
 Propensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts.
 
 
 142
 DoD Directives 1332.30, Enc. 1, p 13 (March 4, 1994) (emphasis added).[9] By so defining "propensity," the Secretary has, contrary to the clear intent of the Congress, effectively transformed a provision that permits rebuttal of the presumption of homosexuality only by proof that one is not a member of the class (i.e., not a homosexual), into a provision that permits individualized rebuttal of the presumption merely by proof that one is not likely to engage in homosexual acts.
 
 
 143
 Quite obviously, "propensity" does not mean "a likelihood," and it certainly does not mean, as the Administration maintains, "likely"; nor can the term reasonably be defined in either of these ways. As common sense suggests, "propensity" is merely "a natural inclination" or an "innate or inherent tendency." Webster's Third New Int'l Dictionary, Unabridged 1817 (1986); see also The Oxford English Dictionary 637 (2d ed.1989) (defining "propensity" as "disposition or inclination to some action, course of action, [or] habit"); The American Heritage Dictionary 1452 (3d ed.1992) (defining "propensity" as "an innate inclination; a tendency"); Able, 880 F.Supp. at 975 (" '[P]ropensity' is generally understood and defined to mean a 'natural inclination' or an 'innate or inherent tendency.' "). Compare Oxford English Dictionary at 345 (defining "homosexual" as a "[a] person who has a sexual propensity for his or her own sex" (emphasis added)); Webster's Dictionary at 1085 (defining "homosexual" as "one who is inclined toward or practices homosexuality" (emphasis added)). The Department of Justice itself argued for a definition of "propensity" as "inclination" before the Ninth Circuit, in the case that apparently serves as the Administration's model for its policy. See Gov't Br. at 23 n. 8, Meinhold v. United States Department of Defense, 34 F.3d 1469 (9th Cir.1994) (No. 93-55242) ("[P]ropensity" is "an 'often intense natural inclination.' " (citing Webster's New Collegiate Dictionary 943 (9th ed.1990))).
 
 
 144
 The Solicitor General's twin responses to this common understanding of the term "propensity" are themselves testament to the indefensibility of the position he defends. First, he notes that the dictionary includes the word "propensity" in the synonymy for the word "leaning," and, therein, in distinguishing "propensity" from "leaning," suggests that the word "propensity" "may apply to an innate or deeply engrained longing or attraction making a certain course of action highly probable." See Gov't Supp. Br. at 4 (quoting Webster's Dictionary at 1286 (definition of "leaning")). This entry does not in any way suggest, contrary to the Solicitor General's belief, that "propensity" is synonymous with "likely"; it suggests only that "propensity" may refer to an innate longing or attraction, which in turn may render certain action more likely--and, at that, the entry only indicates that "propensity" may refer to such an innate longing or attraction, not that it need so refer or even that it ordinarily does in common usage. If anything, the significance of this entry is not that it suggests a possible distinction between "propensity" and "leaning," but that it includes "propensity" as a synonym of "leaning," which it defines, as it does "propensity," as an "inclination." The interchangeability of "propensity," "inclination," and "leaning" all but confirms that "propensity" cannot be defined as "a likelihood," as the regulation purports to do.
 
 
 145
 Second, the Solicitor General combs from the United States Reports two examples of use of the word "propensity," which he claims support his equation of that term with "likely." See Gov't Supp. Br. at 4. Apart from the general irrelevancy of this enterprise, neither of the examples supports the regulatory definition he seeks to justify. The Court in Michelson v. United States, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948), clearly used the word "propensity" to mean "inclination" or "predisposition," not, as the Solicitor General seems to believe, "likely." And although Justice Blackmun (joined by Justice Stevens), in Ballew v. Georgia, 435 U.S. 223, 235, 98 S.Ct. 1029, 1036, 55 L.Ed.2d 234 (1978), did use the words "propensity" and "likelihood" interchangeably in discussing the conviction rates for juries comprised of different numbers of jurors, he did not use either word to mean "likely," as the Department of Defense regulation and implementing interpretations use the phrase "a likelihood."
 
 
 146
 If resort to caselaw is to be had, even a cursory review reveals that the weight of even arguably relevant authority is that the word "propensity" means merely an "inclination," precisely the definition the dictionaries ascribe to the term. See, e.g., Robinson v. California, 370 U.S. 660, 678-79, 82 S.Ct. 1417, 1426-27, 8 L.Ed.2d 758 (1962) (Harlan, J., concurring) ("Since addiction alone cannot reasonably be thought to amount to more than a compelling propensity to use narcotics, the effect of this instruction was to authorize criminal punishment for a bare desire to commit a criminal act." (emphasis added)); Powell v. Texas, 392 U.S. 514, 543, 88 S.Ct. 2145, 2159, 20 L.Ed.2d 1254 (1968) (Black, J., concurring) ("Punishment for a status is particularly obnoxious, and in many instances can reasonably be called cruel and unusual, because it involves punishment for a mere propensity, a desire to commit an offense ...." (emphasis added)).
 
 
 147
 There is simply no credible argument that in common usage "propensity" means "likely"; any argument that it does is sophism. There certainly is no argument that the very Congress that refused to lift the long-time ban on homosexuals in the military and insisted that service members be discharged even for statements that they were homosexual would have regarded these terms as equivalent. For to define the term "propensity" as "likely" is "to create ... a sanctuary in the military where homosexuals could serve discreetly and still be subject to separation for proscribed conduct," the very circumstance the Congress concluded would be "inimical to unit cohesion, morale, welfare and discipline, unenforceable in the field, and open to legal challenge." H.R.Rep. No. 200, 103d Cong., 1st Sess. 289 (1993), reprinted in 1993 U.S.Code Cong. & Admin. News 2013, 2076.
 
 B.
 
 148
 When the regulation was announced, the Secretary attempted to justify it on the ground that the substitution of the statutory term "propensity" for the term "desire," which appeared in the pre-1993 DoD Directive,[10] fundamentally changed the policy from one requiring the discharge of all homosexuals to one requiring the discharge only of those homosexuals likely to engage in homosexual acts. See J.A. at 338-39 (Secretary Aspin news conference) ("[W]e've eliminated the word 'desire' to emphasize that the statement must be one that shows a likelihood to engage in acts."). The change of the word "desire" in the pre-1993 Directive to the statutory term "propensity" was regarded by Congress, however, as only a "minor drafting clarification" never intended to "affect the practical effect of the policy," S.Rep. No. 112 at 289-90, as the Deputy Attorney General herself observed at the time, see id. at 290.
 
 
 149
 Although noting that the change was not intended to have any "practical effect," the committee did, as well, refer to the drafting change as a "useful clarification." Id. Seizing upon this observation, the Solicitor General argues that the usefulness of the change was in its clarification that the focus of the new policy, like the prior policy, is on the likelihood of future homosexual acts, not merely on homosexuality. This argument is plausible, however, only if one accepts the Solicitor's mistaken premise that the prior policy was itself concerned only with homosexual acts; but if one appreciates that the prior policy was clearly status-based, as I believe the Solicitor must, see Gov't Supp. Br. at 6 (noting that committee viewed change as "useful," but omitting any reference to committee statements that change was not to have any practical effect), then it can hardly be maintained that a change which fundamentally altered the policy to one that was entirely conduct-based was merely a "minor drafting clarification" never intended to "affect the practical effect of the policy."
 
 
 150
 Considering that the prior policy was unmistakably addressed to homosexuality per se, rather than the likelihood of conduct, and considering that the Administration had nonetheless argued, by equating "desire" with "a likelihood of future conduct,"[11] that the prior policy was addressed to conduct, it is, if anything, more believable that Congress thought the clarification "useful" as a reiteration that the policy required exclusion of all homosexuals, not only those who are likely to engage in homosexual conduct. That is, it may well be that Congress concluded that, because propensity connotes neither volition nor longing, this term would not be as susceptible to the Administration's transmogrifications as "desire" had proven to be.[12]
 
 C.
 
 151
 The Solicitor General attempts to defend the regulation on the grounds both that it is a reasonable interpretation of an ambiguous statute and that it was necessary to remedy the constitutional infirmity of the statute. Neither of these asserted justifications is sufficient to uphold the regulation.
 
 
 152
 The Solicitor General first asserts that even if "propensity" does not mean "a likelihood" of future conduct, the agency's definition is nonetheless entitled to deference as a reasonable interpretation by the agency charged with the statute's administration. This is not, however, an instance where deference to an agency's regulatory interpretation of a statute is appropriate: Because the statute unambiguously requires the discharge of all known homosexuals, a regulation that limits discharge to only those known homosexuals who are likely to engage in homosexual acts is per se unreasonable. Nor, given that the President does not attempt to defend the regulatory modification on the ground it is needed in the interest of national security, is this a case where the Executive must be afforded deference, despite contrary congressional action, because of the President's preeminent role in matters of national security, see U.S. Const. Art. II, § 2; cf. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20, 57 S.Ct. 216, 220-21, 81 L.Ed. 255 (1936). This is, rather, the archetype of the case described by Justice Jackson, where "the President takes measures incompatible with the expressed or implied will of Congress, [and] his power is [therefore] at its lowest ebb, for ... he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring); see also Chappell v. Wallace, 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983) ("The Framers of the Constitution ... explicit[ly] grant[ed] plenary authority to Congress 'To raise and support Armies'; 'To provide and maintain a Navy'; and 'To make Rules for the Government and Regulation of the land and naval Forces.' " (quoting U.S. Const. Art. I, § 8, cls. 12-14)); Weiss v. United States, 510 U.S. 163, ---- - ----, 114 S.Ct. 752, 760-61, 127 L.Ed.2d 1 (1994) ("Judicial deference ... is at its apogee when reviewing congressional decisionmaking in [the military context].... Congress has primary responsibility for the delicate task of balancing the [constitutional] rights of servicemen against the needs of the military." (internal quotations omitted)).
 
 
 153
 The Solicitor General also attempts to defend the regulation on the grounds that it was necessary to avoid a question of the statute's constitutionality,[13] and is, for that reason, permissible. However, an agency of unelected officials has no authority to alter the plain commands of the Congress simply because, in its view, questions exist as to the constitutional validity of a such a statute. Cf. Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 628-29, 113 S.Ct. 2264, 2282-83, 124 L.Ed.2d 539 (1993) ("[I]n a case of statutory ambiguity, 'where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.' " (quoting Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988))). This is especially true where, as here, Congress explicitly considered, at length, the constitutional validity of its action, and concluded that it was well within its constitutional authority. See Gov't Br. at 20 ("Congress specifically concluded that the new policy does 'not violate the constitutional rights of [homosexuals].' " (quoting S.Rep. No. 112 at 284)).
 
 D.
 
 154
 The Administration vehemently argues, and Lt. Thomasson on occasion agrees, that the validity of the regulation is not before the court and should under no circumstance be addressed by the court. See, e.g., Gov't Supp. Br. at 3.[14] These protestations are to be expected, but they are unavailing. Lt. Thomasson makes two separate arguments in challenging the military's policy, not one. The first, which the majority ably addresses, is that the policy, defined collectively by the statute and the regulation, is unconstitutional because it irrationally presumes prohibited conduct from a mere statement of status. The second, which the majority does not address, is that the military's policy is wholly status-based because the conduct-based regulation is invalid under the statute, and, without the regulation, the statute unconstitutionally authorizes the discharge of homosexuals solely on the basis of their status as homosexuals.
 
 
 155
 The Administration defends against Thomasson's argument that the policy is status-based entirely on the ground that the policy is conduct-based by virtue of the regulatory definition of the statutory term "propensity."[15] Lt. Thomasson responds that, to the extent this is so, the regulation is but "lawyerly afterthought" and "definitional trickery." Appellant's Br. at 26; Appellant's Reply Br. at 19. This is necessarily to draw into question the validity of the regulation.[16] Otherwise, Lt. Thomasson's argument that the policy is entirely status-based is patently specious, because, as the Administration notes, it is contradicted by "the plain regulatory language." Gov't Br. at 23.
 
 IV.
 
 156
 Because I would invalidate the regulation, I must address whether the statute's mandatory exclusion of known homosexuals is constitutionally permissible. Under rational basis review, this exclusion must be sustained if both of the distinctions implicit in the statute--that between homosexuals and heterosexuals and that between known and undetected homosexuals--are rationally related to a legitimate governmental interest. Heller v. Doe, 509 U.S. 312, 318-19, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993).
 
 
 157
 Although not required under rational basis review, see id. at 321, 113 S.Ct. at 2643 ("[The Government] has no obligation to produce evidence to sustain the rationality" of the Act; "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."), Congress made legislative findings more than sufficient to demonstrate that the exclusion of known homosexuals from military service both serves a legitimate governmental interest and is rationally related to that interest.
 
 
 158
 Congress concluded, in findings that are fully supported in the legislative record, see, e.g., S.Rep. No. 112 at 274-75 (recounting General Schwarzkopf's testimony that unit cohesion "is the single most important factor in a unit's ability to succeed on the battlefield"), that "[s]uccess in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion," 10 U.S.C. § 654(a)(6), and that "unit cohesion," defined as "the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members," was "[o]ne of the most critical elements in combat capability," id. at § 654(a)(7). It cannot be gainsaid that the development and preservation of unit cohesiveness essential to combat capability is a legitimate--indeed, compelling--governmental interest.
 
 
 159
 Nor can it be successfully maintained that the exclusion of known homosexuals because of the effect that their manifested sexual attraction for members of the same sex has on unit cohesion does not satisfy the minimal requirement that the exclusion rationally further the government's legitimate interest in preserving unit cohesiveness.[17] In assessing the rationality of the relationship between Congress' objective and its means, "significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it," see Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 28, 96 S.Ct. 2882, 2898, 49 L.Ed.2d 752 (1976), and the burden is on he who challenges the governmental action "to negative every conceivable basis which might support it," Heller, 509 U.S. at 320, 113 S.Ct. at 2643.
 
 
 160
 Here, the Congress of the United States expressly found that "[t]he presence in the armed forces [of homosexuals, as statutorily defined] would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654(a)(15); see also S.Rep. No. 112 at 289 ("The July 19 Memorandum carries forward longstanding Department of Defense policy[;] ... [it] makes it clear that the mandatory discharge policy is necessary because such matters interfere 'with the factors critical to combat effectiveness, including unit morale, unit cohesion, and individual privacy.' "). This finding is in turn supported by, inter alia, the unequivocal testimony of our military leaders, testimony which bears repeating. As General Powell testified,
 
 
 161
 the presence of open homosexuality would have an unacceptable detrimental and disruptive impact on the cohesion, morale, and esprit of the armed forces.
 
 
 162
 ...
 
 
 163
 ... [O]pen homosexuality in units is not just the acceptance of benign characteristics such as color or gender or background. It involves matters of privacy and human sexuality that, in our judgment, if allowed to exist openly in the military, would affect the cohesion and well-being of the force. It asks us to deal with fundamental issues that the society at large has not yet been able to deal with.
 
 
 164
 Id. at 278, 281. And as General Schwarzkopf, who shared General Powell's belief, testified:
 
 
 165
 [I]n my years of military service, I have experienced the fact that the introduction of an open homosexual into a small unit immediately polarizes that unit and destroys the very bonding that is so important for the unit's survival in time of war....
 
 
 166
 Id. at 280 (emphasis added); see also S. Hrg. 103-845 at 780 (testimony of Gen. Otjen) ("[W]hen somebody identifies themselves as a homosexual ... that is disruptive to unit cohesion."); Appellant's Br. at 26 n. 25 ("The so-called 'privacy' and 'sexual tension' rationales--which are variations on the 'unit cohesion' theme, ... if valid at all, arise from the mere presence of homosexuals [in the military].").
 
 
 167
 Given Congress' conclusion that the mere presence of known homosexuals in the military undermines unit cohesiveness, the statutory ban on service by such persons is not just rationally related to the end of unit cohesiveness, it is narrowly tailored to achievement of that end. In fact, it is more narrowly-tailored to that end than was the policy embodied in the pre-1993 Directives, which, by allowing questioning of recruits about their sexual orientation and investigations into the homosexual propensities of service members, sought to ferret out even unknown homosexuals in order to discharge them from military service. The policy therefore would pass constitutional muster even under heightened or strict scrutiny; it certainly passes under the rational basis review applicable to the classifications at issue in this case,[18] as courts repeatedly held under the previous Directive, see, e.g., Steffan v. Perry, 41 F.3d 677 (D.C.Cir.1994) (en banc ); Ben-Shalom v. Marsh, 881 F.2d 454 (7th Cir.1989), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); cf. Woodward v. United States, 871 F.2d 1068 (Fed.Cir.1989) (upholding military's pre-1982 exclusion of homosexuals), cert. denied, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); Rich v. Secretary of the Army, 735 F.2d 1220 (10th Cir.1984) (upholding pre-1982 exclusion even were heightened scrutiny applicable); but see Meinhold v. United States Department of Defense, 34 F.3d 1469 (9th Cir.1994) (interpreting the prior policy as "conduct-based" because the ban on status raises constitutional problems), and as the Solicitor General candidly acknowledged before this court.[19]
 
 V.
 
 168
 Because the Administration's policy regarding homosexuals in the military, implemented through regulation, is fundamentally different than the statute enacted by the Congress and signed into law, I would invalidate that policy as contrary to statutory mandate. I would, however, uphold the policy against military service by known homosexuals that was actually enacted into law by the Congress of the United States, as a permissible exercise of the Legislature's plenary authority to prescribe regulations for the military.
 
 
 169
 Judges RUSSELL, WIDENER, WILKINS, HAMILTON and WILLIAMS join in this opinion.
 
 HALL, Circuit Judge, dissenting:
 
 170
 Before I explain why I would reverse the judgment of the district court, I must comment on the extended discussion of the military context of this case in the majority opinion.
 
 
 171
 I recognize that our duty in weighing the constitutionality of a statute is " 'grave[ ] and most delicate,' " and I do not propose to " 'lightly second-guess' " any decision of Congress or of the President.[1] Though the delicacy of the situation stems from the respect we owe the legislature and executive, the gravity inheres in our duty to defend the Constitution against the trespasses of those branches, no matter how carefully or pedantically they be constructed, and notwithstanding their popularity. The Founders gave us lifetime tenure to assure that we would not shrink from that duty.[2]
 
 
 172
 Likewise, though raising the armies and commanding them are the exclusive tasks of the Congress and President, we have a role--a vital one--in ensuring that the military remains submissive to the Constitution and civil authority. We have now had a large standing army for half a century, and the Republic has endured. In the annals of history, our experience must be counted as the exception rather than the rule, and I am convinced that the presence of a strong and independent judiciary, upon which the people may rely to guard individual rights, deserves much of the credit for this good fortune. Freedom is not inherited; it is earned through eternal vigilance. The military is a sentinel in its way, and we in ours.
 
 
 173
 With that said, I must and do concede that the military is a unique society within a society. The discipline and self-sacrifice that characterize military service have little in common with the liberty and self-interest of civilian life, and rules of constitutional law designed for the latter must sometimes be tailored to the special needs of the military.[3] Those rules nonetheless apply; they must apply.
 
 
 174
 Implicit in the term "national defense" is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution.... It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile.
 
 
 175
 United States v. Robel, 389 U.S. 258, 264, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967). Aside from cheapening our national values, a broad "military exception" from the Constitution in the interest of defending us from foreign danger could transform the military into a domestic danger. Love of one's own liberty is inborn; love of another's must be learned. Permitting disrespect of constitutional rights to flourish within the military would inevitably cause disrespect of them without it. Consequently, while I will defer, as I ought and must, to the professional judgment of military commanders on things military, I may never defer to their judgment on things constitutional.
 
 I.
 
 176
 It is critical in this case to resist falling into discussion of generalities, as if each homosexual were a clone of some preening archetype. This case is about Lieutenant Paul Thomasson, and only him. The behavior of others is beside the point. Even without the challenged policy, some homosexuals would be unfit for military service, and some among them whose sexual misconduct were the root of their unfitness. The same, of course, can be said for heterosexuals. One need only to read the newspaper to know that the libidos of heterosexual American servicemen are not always restrained by military codes of conduct. But most are.
 
 
 177
 So, why was Lt. Paul Thomasson discharged?
 
 
 178
 It was not because of "conduct" in any ordinary sense of the word. To say his service record is "spotless" risks understatement; "sparkling" is a better choice. In his decade in the Navy, Lt. Thomasson rose through the ranks from ensign to full lieutenant. He has excelled in every task assigned him. In April 1991, he was chosen over numerous peers to be an intern to the Joint Chiefs of Staff at the Pentagon. He spent a year there, preparing briefings for Joint Chiefs Chairman Gen. Colin Powell and Secretary of Defense Richard Cheney, and he accompanied them to Congressional hearings on the military budget and force reductions. He was awarded the Joint Service Commendation Medal for "superlative performance" of that role, and, at the end of his internship, Gen. Powell thanked him in a personal letter for "contribut[ing] immeasurably" to the Joint Chiefs' success. Thomasson closed his career in the service of Rear Admiral Albert Konetzni, who, ironically, was in charge of implementing the policy on homosexuality at issue here; nevertheless, Admiral Konetzni recommended him for immediate promotion to Lieutenant Commander on the very day of his discharge.[4]
 
 
 179
 The performance coin has no other side: the Navy does not complain that Thomasson ever rendered middling, let alone deficient, service. Moreover, the Navy has no proof that Thomasson has engaged in sodomy or broken any other conduct rule, high or petty. Conduct cannot be the cause of his discharge.
 
 
 180
 Likewise, the discharge cannot be explained by Thomasson's homosexual status per se. Under the policy,[5] homosexuals are expressly permitted to serve.
 
 
 181
 It is only because he has said that he is homosexual.
 
 
 182
 There is no difference between being and saying except that saying produces a reaction in others. The issue, then, is whether saying, and producing a reaction, is a ground for discharge that may constitutionally be applied to Lt. Thomasson. I believe that it is not.
 
 II.
 
 183
 A classification violates equal protection if effecting an impermissible purpose was a (not the ) motivating factor for the classification, because[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.
 
 
 184
 Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).
 
 
 185
 Private prejudice is a private matter; we are free to hate. But the same concept of liberty for all that protects our prejudices precludes their embodiment in law. "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984). This rule applies even though the group targeted by the prejudice is not a "suspect" or "quasi-suspect" class for equal protection analysis. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 448, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985).[6] Consequently, the desire to disadvantage a politically unpopular group is never a legitimate governmental interest. Id. at 447, 105 S.Ct. at 3258; United States Dep't of Agriculture v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973).
 
 
 186
 There is a great deal of evidence that the statute was motivated by a desire to accommodate prejudice against homosexuals. In announcing the policy, the President stated that "those who oppose lifting the ban are clearly focused not on the conduct of individual gay service members, but on how nongay service members feel about gays in general and, in particular, those in the military service." Assistant Secretary of Defense Edwin Dorn testified that "much of the resistance to gays is grounded in fear and prejudice." Retired Admiral Thomas Moorer, former Chairman of the Joint Chiefs of Staff, served on an advisory committee during development of the new policy. He was quite blunt about his views: homosexuals engage in "a filthy, disease-ridden practice," are "inherently promiscuous," and have no place in the military. He stated that many other "military people" share his views. Finally, Lt. General John Otjen, who chaired the Military Working Group, stated that "there's a collective sense in the military ... that homosexuality is wrong." Gen. Otjen believed that all members of the Military Working Group shared this "collective sense." Moreover, he conceded that, but for fear of and prejudice against homosexuals, the policy would be unnecessary.
 
 
 187
 The evidence that prejudice against homosexuals is a purpose of "don't ask, don't tell" is therefore quite strong.
 
 III.
 A.
 
 188
 We are told, though, that tolerating this intolerance is essential to "unit cohesion." Even if accommodating the supposedly widespread disdain for gays were a permissible governmental purpose--and it is not--there is no evidence that the discharge of Lt. Thomasson will rationally further that purpose. Indeed, there is only speculation that the discharge of any homosexual would do so.
 
 
 189
 Dr. Lawrence J. Korb, Assistant Secretary of Defense under President Reagan, offered this critique of the "unit cohesion" rationale:
 
 
 190
 There are at least three ... major problems with the "unit cohesion" argument. First, it represents a severe and somewhat defeatist underestimation of the ability of today's servicemembers to keep their focus on professional military concerns; it also represents a uniquely curious (and, I believe, incorrect) admission that our soldiers and sailors could not effectively follow orders and do their jobs if we lifted the ban. Second, kowtowing to the prejudices of some by excluding others has never been an acceptable policy rationale, either in the military or in our society at large. And third, in the several units where acknowledged homosexuals are serving today (usually, by court order), there are no signs of unit disintegration or bad morale.
 
 
 191
 General Otjen, while a strong supporter of the "unit cohesion" hypothesis, admitted that it was based on the personal views of members of the Military Working Group rather than hard facts. The lack of real evidence is not for lack of investigating. In 1992, the General Accounting Office investigated similar organizations that permit open homosexuality in their ranks, and, the next year, the Secretary of Defense commissioned a study of analogous organizations and foreign militaries by the Defense Research Institute of the RAND Corporation. Both studies reported no serious problems resulting from the presence of open homosexuals. See Able v. United States, 880 F.Supp. 968, 978 (E.D.N.Y.1995).
 
 
 192
 In any event, we have in the record before us a real homosexual, a real unit, and hence a real test of the "unit cohesion" hypothesis. Lieutenant Thomasson served for over fifteen months after admitting his homosexuality. His stellar job performance continued. There were in fact persons in his unit who disapproved of homosexuality, but they continued to do their duty and had no difficulty working with Lt. Thomasson. In fact, some were forced to question their preconceptions in light of Lt. Thomasson's example.[7] Not a single sailor testified that he had suffered even mildly diminished morale.
 
 B.
 
 193
 The actual experience in Thomasson's unit should not surprise us. The ability of the American soldier to put duty before prejudice has been tested before.
 
 
 194
 "Unit cohesion" is a facile way for the ins to put a patina of rationality on their efforts to exclude the outs. The concept has therefore been a favorite of those who, through the years, have resisted the irresistible erosion of white male domination of the armed forces. Though the prejudices underlying such resistance have doubtless outlived the erosion, they have not manifested themselves in a loss of "unit cohesion."
 
 
 195
 Race is the obvious example. "Don't ask, don't tell" was formulated when the chairman of the joint chiefs of staff was a black man, a black man whose presence in the otherwise all-white inner circle of our military caused no apparent friction or decay in its morale, performance, or cohesion. Likewise, I am enough of a realist to know that there are racists serving in our armed forces, racists to whom Gen. Powell's high rank must have been distasteful. They did their duty anyway. Lest the irony escape anyone, consider the opinion of a committee, much like the Military Working Group behind "don't ask, don't tell," that studied the proposed racial integration of the Navy in the 1940s:
 
 
 196
 Enlistment for general service implies that the individual may be sent anywhere,--to any ship or station where he is needed. Men on board ship live in particularly close association; in their messes, one man sits beside another; their hammocks or bunks are close together; in their common tasks they work side by side; and in particular tasks such as those of a gun's crew, they form a closely knit, highly coordinated team. How many white men would choose, of their own accord, that their closest associates in sleeping quarters, at mess, and in a gun's crew should be of another race? How many would accept such conditions, if required to do so, without resentment and just as a matter of course? The General Board believes that the answer is "Few, if any," and further believes that if the issue were forced, there would be a lowering of contentment, teamwork and discipline in the service.
 
 
 197
 Experience is the dread enemy of prejudice, and experience has routed the views of the General Board.
 
 C.
 
 198
 Another incongruity of the "unit cohesion" hypothesis behind "don't tell" is that it encourages lying in the interest of building and maintaining "bonds of trust" among the troops. A relationship built on deception is anything but a "bond of trust." As the court observed in Able, 880 F.Supp. at 979,
 
 
 199
 [T]he court deems extraordinary ... the almost total lack of concern evidenced in the Congressional hearings and the Committee reports as to the impact on unit cohesion of the attempt to enforce secrecy on homosexuals and to enlist them in the perpetration of a hoax on heterosexuals. Common sense suggests that a policy of secrecy, indeed what might be called a policy of deception or dishonesty, will call unit cohesion into question.
 
 
 200
 * * *
 
 
 201
 ... [H]eterosexuals and homosexuals alike would be entitled to think it demeaning and unworthy of a great nation to base a policy on pretense rather than truth.
 
 
 202
 The sad corollary of this "policy of pretense" is that moral courage like that displayed by Lt. Thomasson is punished.
 
 IV.
 
 203
 The policy also operates in an unconstitutional manner. Its bedrock is a presumption that everyone will fail to comply with rules of conduct--a declared homosexual is bound to misbehave, and the members of his unit will doubtless allow private prejudice to override discipline. A presumption of misconduct from a person's status, or even from his private prejudices, does not comport with due process.
 
 
 204
 An analogy offered by Lt. Thomasson at oral argument makes the point well. The Supreme Court has upheld the constitutionality of the military's uniform regulations, notwithstanding that they bar the wearing of yarmulkes. Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). Now suppose a serviceman writes a letter to his superior stating, "I am an Orthodox Jew." Has he broken the uniform regulations? Of course not. Should he be disciplined or discharged on account of his presumed "propensity" to wear a yarmulke? Of course not. Should he be discharged because his status and accompanying presumed propensity are presumed to stir up anti-Semitism among the majority gentiles? Of course not. In America, we presume that individuals obey the rules until they prove otherwise. If persons do not obey rules with which they disagree, or are presumed to act upon every urge or desire whatever the legal consequences, then rules are a vain exercise indeed.
 
 
 205
 [M]ost people obey the law even when they disapprove of it. This obedience may reflect a generalized respect for legality or the fear of prosecution, but for whatever reason, the law's prohibitions are matters of consequence.
 
 
 206
 Jacobson v. United States, 503 U.S. 540, 551, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 174 (1992). See also Powell v. Texas, 392 U.S. 514, 543, 88 S.Ct. 2145, 2159, 20 L.Ed.2d 1254 (1968) (Black, J., concurring) ("Punishment for a status is particularly obnoxious ...; the mental element is not simply part of the crime but may constitute all of it.") Cf. Robel, 389 U.S. at 262-71, 88 S.Ct. at 423-428 (member of Communist Party could not be presumed to have the specific intent to further its unlawful goals).
 
 V.
 
 207
 The intolerability of a presumption of misconduct from a status renders irrelevant the majority's unremarkable holding that the First Amendment does not bar the evidentiary use of an "admission." Of course it does not. But Thomasson did not "admit" anything that could justify his discharge. He said, "I am gay." Let us take that as admitted. "A member's sexual orientation is considered a personal and private matter, and is not a bar to continued service ... unless manifested by homosexual conduct...."[8] Thomasson has not "admitted" any homosexual conduct.
 
 
 208
 The rejoinder, of course, is that the statute and policy define speech as "conduct." This definition fails to withstand constitutional scrutiny, for two reasons. First, as I have already discussed, it impermissibly presumes that homosexuals are unable to obey rules of conduct. Second, it creates a classification among homosexuals based solely on speech. Because there is no reason even to "rationally speculate"[9] that declared homosexuals are more likely to break the rules than undeclared--the opposite speculation seems far more accurate--this rule must be targeted at suppressing the speech itself.[10] Here we meet up with the First Amendment, but on much different ground than the majority tackles it.
 
 
 209
 Suppressing speech is "grave[ ] and most delicate" stuff. The military has a broader power to control speech than a civilian government, Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), but even there the power is exceedingly narrow: speech may be suppressed only if it is likely to interfere with vital prerequisites to military effectiveness. Id. at 354, 100 S.Ct. at 599. The "vital prerequisite" here is, I suppose, the accommodation of the prejudices of heterosexual servicemen. I very much doubt that such accommodation--never a legitimate legislative end--can ever be a "vital prerequisite" to the military's mission. In any event, Lt. Thomasson has proved beyond any doubt that his speech had no deleterious impact at all, let alone to some "vital prerequisite" to military effectiveness. If anything, the expulsion of a fine officer in retaliation for his speech will ultimately prove worse for the Navy.
 
 VI.
 
 210
 Lt. Paul Thomasson has been declared unfit to defend our country based on nothing more than an expression of his state of mind. The expression was not illegal, and the fact admitted is not a ground for discharge. His record of service is superb, and the Navy presented absolutely no evidence that he has violated any military rule of conduct in any way at any time, and absolutely no evidence that his exemplary record is not indicative of his likely future behavior.
 
 
 211
 Lt. Paul Thomasson's career is over because it is presumed that he will misbehave in a manner that is assumed to incite the prejudices of his colleagues, whom it is speculated will abandon their duties to defend the United States rather than tolerate him in their midst. There is no proof of any of these hypotheses in the record, and there is abundant disproof. In the final analysis, the expression of Lt. Thomasson's thoughts, without more, is the cause of his "honorable" banishment from the Navy.
 
 
 212
 "I think we must let his mind alone."[11]
 
 
 213
 I dissent.
 
 
 214
 Judges ERVIN, MICHAEL and MOTZ join in this dissent.
 
 
 
 [1]
 President Clinton adopted an interim policy effective until July 15, 1993, that retained the prior ban on service by homosexuals, with two modifications: 1) new recruits would not be questioned about their sexual orientation; and 2) homosexuals who had not engaged in homosexual acts would be processed through separation from active duty, but would be placed in the Standby Reserve during the interim period. S.Rep. No. 112 at 268
 
 
 [2]
 Section 571(d) provides, in relevant part:
 SENSE OF CONGRESS.--It is the sense of Congress that--
 (1) the suspension of questioning concerning homosexuality as part of the processing of individuals for accession into the Armed Forces under the interim policy of January 29, 1993, should be continued, but the Secretary of Defense may reinstate that questioning with such questions or such revised questions as he considers appropriate if the Secretary determines that it is necessary to do so in order to effectuate the policy set forth in section 654 of title 10, United States Code.
 
 
 [3]
 "Homosexual act" is defined by the statute as:
 (A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and
 (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A).
 10 U.S.C. § 654(f)(3). The relevant portion of the U.C.M.J. prohibits only "sodomy," defined as "unnatural carnal copulation with another person of the same or opposite sex or with an animal." Id. at § 925.
 
 
 [4]
 See DoD Directive 1332.30, Encl. 1, p 18 (March 4, 1994) ("Statement that a Member Is a Homosexual or Bisexual or Words to That Effect" defined as "Language or behavior that a reasonable person would believe was intended to convey the statement that a person engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts.")
 
 
 [5]
 See also Policy Concerning Homosexuality in the Armed Forces: Hearings Before the Senate Comm. on Armed Services, 103rd Cong., 1st Sess. 753 (1993) (S.Hrg.103-845) (testimony of Secretary Aspin) ("The point of rebuttable presumption is that if the issue comes to the attention of the authorities and the authorities say you have just said you are gay, you have the opportunity to present some evidence to the contrary."); id. at 746 (Secretary Aspin answering "Correct" to Senator Bryan's query: "So, the rebuttable presumption is a rebuttable presumption that the individual then, in effect, would carry the burden of establishing that he or she was not homosexual?")
 
 
 [6]
 Of course, a heterosexual would be subject to discharge under Article 125 of the U.C.M.J., 10 U.S.C. § 925, if the homosexual act he commits is sodomy
 
 
 [7]
 See also Memorandum for the President from Attorney General Janet Reno, Defensibility of the New Policy on Homosexual Conduct in the Armed Forces 1 (July 19, 1993), reprinted in S. Hrg. 103-845 at 706 ("The policy reiterates the prior Defense Department view that 'homosexuality is incompatible with military service because it interferes with the factors critical to combat effectiveness.' "); Appellant's Br. at 26 ("[T]he long history of the policy--including even the recent legislative history surrounding the [1993] Act--establishes beyond any doubt that the chief concern among policymakers has always been to combat the mere presence of homosexuals in the ranks." (citing, inter alia, Able v. United States, 880 F.Supp. 968, 976-80 (E.D.N.Y.1995)))
 
 
 [8]
 The Solicitor General contends that there is a difference between a homosexual "orientation" and a homosexual "propensity" insofar as the likelihood that one will engage in homosexual acts is concerned, a difference the Administration has incorporated into its regulatory definition of "orientation." See DoD Directive No. 1332.30, Encl. 1, p 16 (March 4, 1994) (defining "sexual orientation" as "[a]n abstract sexual preference for persons of a particular sex, as distinct from a propensity or intent to engage in sexual acts"). I do not know what homosexual orientation is, if it is not the propensity to commit homosexual acts; indeed, I do not understand how one even knows that he has a homosexual orientation except by realizing that he has a propensity toward the commission of homosexual acts. See Able, 880 F.Supp. at 975 (characterizing the distinction between "orientation" and "propensity" as "Orwellian"). But if there are indeed persons who are homosexually oriented but do not have a homosexual propensity, I would agree that the statute does not require their discharge, at least under the statements provision. I would also agree that if, as Deputy Attorney General Gorelick testified, a homosexually-oriented person is merely an undetected homosexual, the statute accepts the continued service of such persons as a consequence of the compromise that service members would not be asked about their sexual orientation. See S. Hrg. 103-845 at 808 (Gorelick testimony); see also Memorandum for the President from Attorney General Janet Reno, Defensibility of the New Policy on Homosexual Conduct in the Armed Forces 1 (July 19, 1993), reprinted in S. Hrg. 103-845 at 706 ("[H]omosexual conduct (but not an unmanifested orientation) would be grounds for separation from service.")
 
 
 [9]
 See also DoD Directive 1332.30, Enc. 2, p C (March 4, 1994) ("A statement by a member that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts.")
 
 
 [10]
 The statute now defines "homosexual" as "a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts, and includes the terms 'gay' and 'lesbian.' " 10 U.S.C. § 654(f)(1) (emphasis added). The pre-1993 Directive defined "homosexual" as "a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts." DoD Directive 1332.14 (March 9, 1982), reprinted in 32 C.F.R. Ch. 1, Pt. 41, App. A, p H.1.b. (1) (1994) (emphasis added)
 
 
 [11]
 See, e.g., Gov't Br. at 10 (July 30, 1993), Meinhold v. United States Department of Defense, 34 F.3d 1469 (9th Cir.1994) (No. 93-55242) ("The regulatory language, DoD's reasonable interpretation, and judicial precedent make plain that the [pre-1993] policy targets members who have engaged or ... will likely engage in homosexual conduct. The policy targets homosexual 'conduct--past, present, and future, but conduct nonetheless.' " (citing Watkins v. United States Army, 847 F.2d 1329, 1362 (9th Cir.1988) (Reinhardt, J., dissenting))); cf. Steffan v. Perry, 41 F.3d 677, 687 n. 7 (D.C.Cir.1994) (en banc ) ("The Ninth Circuit [in Meinhold ] construed the 'desires' language to mean something akin to intent.")
 
 
 [12]
 Compare Webster's Dictionary at 612 (defining "desire" as "1: conscious impulse toward an object or experience that promises enjoyment or satisfaction in its attainment ... 2 a: an enduring and passionate longing or intense yearning: an urgently impelling motive toward attainment: CRAVING, APPETENCY ... b(1): a strong physical inclination (2): erotic urge: sexual attraction or appetite ... c: a striving after in intent: a deliberate choice or preference") with id. at 1817 (defining "propensity" as "a natural inclination: innate or inherent tendency")
 
 
 [13]
 See Gov't Br. at 23-24 ("[T]o the extent that the military's reasonable construction of the term 'propensity' avoided a serious question regarding the constitutionality of this statutory provision, the district court was all the more required to defer to that construction." (citing Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 627-30, 113 S.Ct. 2264, 2282-83, 124 L.Ed.2d 539 (1993))); see also id. at 16 (arguing against strict scrutiny because "[t]he classification here is directed at homosexual 'acts and the likelihood of acts' ")
 
 
 [14]
 Lt. Thomasson does, at times, purport not to challenge the regulation. See, e.g., Appellant's Rule 28(f) Supp. Mem. at 12 (merely noting that an argument raised by amicus curiae is not necessarily before the court); id. at 2, 5. But see Appellant's Resp. to Mot. of Amicus Curiae Family Research Council for Leave to Participate in Oral Argument at 2 & n. 1 (expressly representing that he challenges validity of regulation). He does so, however, for what I regard as the same transparent reasons that underlie the Solicitor General's entreaties that the regulation is not before us. Although Lt. Thomasson recognizes that he must challenge the regulation in order to challenge the statute's exclusion of homosexuals on grounds of status, he nevertheless prefers, should the statute be upheld, that the regulation remain intact because of the sanctuary it creates. Under these circumstances, to acquiesce in the collaborative argument by the parties that we should not address the validity of the regulation would, in my judgment, be to allow ourselves, as judges, to be used as pawns in a political game between players with only putatively different interests
 
 
 [15]
 See, e.g., Gov't Br. at 11 ("The legislative classification in 10 U.S.C. 654(b)(2)--barring service by members who state that they are homosexuals and who fail to demonstrate that they do not and are not likely to engage in homosexual acts--does not violate equal protection."); id. ("[T]he Government has a legitimate interest in prohibiting homosexual acts in the military. To avoid the risk to military effectiveness posed by such acts, Congress enacted a classification that reasonably presumes--subject to rebuttal by the service member--that a member who states that he is a homosexual is likely to act consistently with his sexuality and engage in prohibited homosexual acts."); id. at 12 ("Thomasson's claim that the statute violates the First Amendment also lacks merit.... The new policy treats a service member's statement of homosexuality as a basis from which to presume, in the absence of rebuttal by the member, that he engages in, or is likely to engage in, homosexual acts. The First Amendment does not prohibit such evidentiary use of a member's statements."); id. at 13 ("Thomasson argues (Br. at 34) that heightened scrutiny should apply because the policy is directed, he contends, at 'sexual orientation.' As we show infra, pp. 22-24, however, this argument fundamentally misapprehends the relevant classification, which the district court correctly held is directed at homosexual 'acts and the likelihood of acts.' "); id. at 22 ("The Directives equally make clear that the new policy is conduct-directed and does not target orientation."); id. at 23 ("Thomasson's repeated assertion, (e.g., Br. 24, 33-37) that the policy classifies on the basis of homosexual orientation cannot be reconciled with the plain regulatory language that equates 'propensity' with 'likelihood.' " (emphasis added))
 
 
 [16]
 Reno v. Koray, --- U.S. ----, ---- n. 2, 115 S.Ct. 2021, 2024 n. 2, 132 L.Ed.2d 46 (1995), urged upon us by both the government and Lt. Thomasson as authority against our consideration of the validity of the regulation, does not in any way suggest that we should abstain from consideration of this question. In that case, unlike in that sub judice, the plaintiff had abandoned his constitutional argument altogether
 
 
 [17]
 Obviously it is this propensity, this attraction for members of the same sex, that, at once, renders permissible the military's exclusion of homosexuals in order to preserve unit cohesion and also distinguishes the ban on homosexuals from what would be an emphatically impermissible policy of excluding service members based upon, for example, race
 
 
 [18]
 Jacobson v. United States, 503 U.S. 540, 551-52, 112 S.Ct. 1535, 1541-42, 118 L.Ed.2d 174 (1992), and Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), which held unconstitutional the criminal punishment of individuals based upon a presumption of action from mere status or predisposition, do not dictate otherwise. Discharge from military service is not "punishment," as the District of Columbia Circuit observed in Steffan, 41 F.3d at 687. See also Gov't Br. at 30 ("Jacobson was a criminal prosecution, which involves restrictions not applicable to military personnel decisions."). In any event, the statute as written does not presume likely conduct from status, but merely homosexual propensity (that is, inclination or attraction) from a statement or other manifestation of homosexuality
 
 
 [19]
 THE COURT: Does the United States believe that if this regulation permits the discharge of someone who is homosexual, irrespective of conduct, then the regulation is invalid?
 COUNSEL: No.
 THE COURT: So in other words ... [t]he military and Congress can provide for the discharge of any individual who is homosexual in the view of the Department of Justice; is that correct, Mr. Kneedler?
 COUNSEL: Well, this case does not present that.
 THE COURT: I understand that.
 ...
 COUNSEL: And that yes, in the sense that the--that the military is entitled to make a judgment that an expression ... that one is homosexual has a correlation at least, as the D.C. Circuit said in Steffan, a correlation that that--
 THE COURT: My question is: Suppose there's no correlation. Irrespective of conduct, may the military discharge homosexuals in the view of the Department of Justice constitutionally?
 COUNSEL: That would present--That would present a more difficult question. We acknowledge that--
 THE COURT: Does the United States have a position on that? Because in my view that's what Congress intends. And the question is whether the executive branch has attempted to circumvent that through the regulations. So I may have to face that question, and I need the Department's view on that.
 ...
 THE COURT: Does the United States have a position on the question I asked; or does it not? It may not. I'm just asking.
 COUNSEL: We believe that such a policy would be constitutional. But we acknowledge that because of the overriding needs of the military, we believe that such a policy would be constitutional.
 Transcript of Oral Argument, Sept. 12, 1995, at 44-47 (emphasis added).
 
 
 [1]
 See supra at 923 (quoting Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927) (opinion of Holmes, J.), and Board of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 251, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990))
 
 
 [2]
 As Alexander Hamilton argued at the time:
 Considerate men of every description ought to prize whatever will tend to beget or fortify that temper [independence] in the courts; as no man can be sure that he may not be tomorrow the victim of a spirit of injustice, by which he may be a gainer today
 ...
 That inflexible and uniform adherence to the rights of the Constitution, and of individuals, which we perceive to be indispensable in the courts of justice, can certainly not be expected from judges who hold their offices by a temporary commission.
 Federalist No. 78 (Hamilton), at 470-471 (Rossiter ed.1961).
 
 
 [3]
 E.g., Brown v. Glines, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980) (permitting restrictions on speech likely to interfere with vital prerequisites to military effectiveness)
 
 
 [4]
 The high esteem reflected by this recommendation was nothing new. In 1990, Commander T.M. Feeks noted that Thomasson "routinely outperforms many lieutenant commanders." In 1992, Air Force Brigadier General C.V. Jones of the Joint Chiefs of Staff, who had directly supervised Thomasson during his internship, reported that "he is ready now for promotion to Lieutenant Commander." Rear Admiral Alexander Krekich, who shared supervisory responsibilities with Gen. Jones, concurred in this recommendation. Adm. Krekich described Thomasson as "a super star--one of the Navy's future leaders" and as "the top intern among a group of superlative junior officers." He concluded, "I would personally seek out to serve with me again! Outstanding 'Flag lieutenant' & 3 or 4 star material. Groom early." I could go on and on, inasmuch as the effusive tone of this praise pervades Thomasson's entire service record
 
 
 [5]
 The policy explicitly states that "homosexual orientation is not a bar" to "service entry or continued service." Department of Defense Directive 1332.30 at 2-1 para. C (March 4, 1994)
 
 
 [6]
 It is not necessary, therefore, to decide here whether homosexuals are a suspect or quasi-suspect class
 
 
 [7]
 The views of Yeoman Third Class John J. Broughton are typical:
 At first [after Thomasson's disclosure], I was shocked and did not know whether or not to back out [of a volunteer assignment to work with Thomasson] and work in my old office. I did not know whether I could work with a homosexual. I decided to stick with the decision I made prior to knowing of LT Thomasson's disclosure. I am glad I did. The knowledge I have gained ... from LT Thomasson is invaluable.... He was always professional towards me. LT Thomasson[,] in my opinion, is the best "LT" in the Navy.... His sexual orientation had no adverse effect on myself or to the Navy. With so few good naval officers, the Navy should definitely keep LT PAUL THOMASSON.
 
 
 [8]
 Directive 1332.30, para. C
 
 
 [9]
 See Heller v. Doe, 509 U.S. 312, 318-20, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (stating constitutional minimum for legislative findings underlying a classification)
 
 
 [10]
 Hence, the popular label for this prong of the policy--"don't tell"--is quite accurate
 
 
 [11]
 American Communications Ass'n v. Douds, 339 U.S. 382, 444, 70 S.Ct. 674, 706, 94 L.Ed. 925 (1950) (Jackson, J., concurring and dissenting)